187 So.2d 170 (1966)
Russell E. PRACK et al., Plaintiffs-Appellants,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY et al., Defendants-Appellees.
No. 10532.
Court of Appeal of Louisiana, Second Circuit.
March 23, 1966.
Rehearing Denied May 5, 1966.
Writ Refused June 23, 1966.
*171 H. Alva Brumfield, Sylvia Roberts, Baton Rouge, J. L. Shaver, Wynne, Ark., for appellants.
Mayer & Smith, Shreveport, for United States Fidelity & Guaranty Co.
Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for Insurance Co. of North America.
Cook, Clark, Egan, Yancey & King, Shreveport, for Aetna Cas. Co.
Nesib, Nader, Shreveport, for Confederate Memorial Medical Center.
Before HARDY, AYRES and BOLIN, JJ.
HARDY, Judge.
This is an action ex delicto in which plaintiff, for himself and for the benefit of his minor daughter, seeks the recovery of damages for injuries to and eventual death of his wife. Named as defendants were United States Fidelity & Guaranty Company, Indemnity Insurance Company of North America, and Aetna Casualty & Surety Company as the general liability insurers of Physicians & Surgeons Hospital, Inc., Dr. Hugh C. Ilgenfritz and Dr. Frank F. Marsh, respectively. Pursuant to the verdict of the jury judgment was entered in favor of defendants rejecting plaintiff's demands, from which judgment he prosecutes this appeal.
Specifications of error primarily concern the general charge of manifest error on the ground that the preponderance of the evidence established the negligence of defendants' assureds, which claim obviously presents what is an exclusively factual question. Additionally, it is urged that the trial court erred in refusing to give special charges to the jury with reference to the application of the doctrine of res ipsa loquitur.
It is necessary to narrate the factual circumstances established by the record. On Monday, September 12, 1960, plaintiff called Dr. Hugh C. Ilgenfritz and advised him that his wife, Mrs. Rebecca Irene Prack, was suffering severe recurring attacks of nausea and vomiting accompanied by stomach pains. The Prack's regular physician, Dr. C. L. Black, was out of the city and his patients who might need attention during his absence were referred to Dr. Ilgenfritz. In accordance with the advice of Dr. Ilgenfritz, Mrs. Prack was admitted to the Physicians & Surgeons Hospital in Shreveport on the afternoon of September 12th. The patient's history at the time of her admission to the hospital indicated she was suffering from nothing more than an upset stomach, and, in all probability, would be able to leave the hospital and return to her home the next day. Certain medications and an intravenous injection were administered by or under orders of the attending physician. However, out of an abundance of precaution, the doctor ordered X-rays to be made. After checking the X-rays, which were taken on Tuesday, September 13th, and consulting with the radiologist, Dr. Ilgenfritz began to suspect the possibility of an obstruction of the small intestine, and, accordingly, advised Mrs. Prack that it would be necessary for her to remain in the hospital. X-rays made on the 14th disclosed the presence of more air and fluid in the small bowel and none in the large intestine, which finding strengthened the tentative diagnosis of locked bowels or obstruction of the small intestine. Despite continued medication and the administration of enemas, the patient's condition did not improve and Dr. Ilgenfritz suggested that, in his *172 opinion, an operation might be necessary. In a final effort to avoid this necessity a stomach suction tube was used. On Thursday, September 15th, X-rays were again made and when examined by Dr. Ilgenfritz about 1:00 o'clock in the afternoon they indicated the steady progression of obstruction which, in the doctor's opinion, required immediate surgical intervention. Dr. Ilgenfritz discussed this matter with Mr. and Mrs. Prack, and, although Mrs. Prack was very upset, apprehensive and fearful of the operation, they agreed to its performance.
One of the contentions of plaintiff is that Dr. Ilgenfritz promised to equip Mrs. Prack's hospital room, No. 325, as a recovery room in view of the fact that the operation was scheduled for 4:00 o'clock, at which time the recovery room maintained by the hospital would be closed. This was denied by Dr. Ilgenfritz, who testified that he discussed the matter with Mr. Prack, advised him that the service of a special registered nurse would be procured and that the customary facilities and equipment, including oxygen and a suction machine, would be available in Room 325.
In accordance with Dr. Ilgenfritz's orders preparations were made for the performance of the operation. Dr. Ilgenfritz called Dr. Frank F. Marsh, requesting and obtaining his consent to serve as the anesthesiologist and ordered, pursuant to Dr. Marsh's instructions, the administration of pre-operative medications, consisting of demerol, scopolamine and phenergan. These drugs were administered about 3:00 o'clock, P. M., and about thirty minutes later Dr. Marsh visited Mrs. Prack in her room for a very few minutes, after which he went to the operating room on the fourth floor of the hospital and made necessary preparations. The patient was taken to the operating room at about 4:00 o'clock, was put to sleep by use of an intravenous barbiturate, either sodium seratol or pentothal, followed by an administration of succinyl choline chloride. The patient was then intubated and Dr. Marsh administered the principal anesthetic agent, cyclopropane, accompanied by a top vapor of ether.
Dr. Ilgenfritz made the incision of the abdomen at 4:18 P. M.; released a band of fibrous tissue which was completely blocking the small intestine; also released another band of scar tissue that he considered might cause trouble in the future; completed the operation and closed the wound at 5:46 P. M. After applying the dressing to the wound, and, in response to his inquiry, receiving the assurance of Dr. Marsh that the patient was all right, Dr. Ilgenfritz left the operating room, went down to the waiting room on the third floor and talked to Mr. Prack, to whom he explained that the operation had confirmed the opinion that it was necessary in order to save Mrs. Prack's life; that her condition was good and barring unforeseen complications she should make an uneventful recovery. After this brief conversation Dr. Ilgenfritz walked upstairs to the doctors' dressing room on the fourth floor, changed to his street clothes and returned to the third floor to visit a patient for the purpose of removing the stitches from an operative incision and changing the dressing in order that he might be released from the hospital the next day.

Dr. Marsh, satisfied that Mrs. Prack was beginning to recover from the effects of the anesthetic, as evidenced by her reactions in moving her head and biting down on the tube which passed through her mouth into the throat, removed the tube and accompanied the patient as she was removed to her room, No. 325, to which she returned about 6:10 o'clock, P. M. Present at the time was Mrs. Carrie Mae Powell, the special registered nurse who had been called to attend Mrs. Prack, and Mrs. Marion Laird, the charge nurse of the third floor of the hospital, who was on duty at the time. Mrs. Prack's blood pressure was taken and shown to be 104 over 60, which was regarded as within a reasonably normal range following an operation. *173 Dr. Marsh intubated the patient, attaching the Levin tube to a suction pump, affixed an oxygen nasal catheter and then, satisfied as to the condition of the patient, left the room and returned to the operating room on the fourth floor where he was scheduled to administer an anesthetic to another patient in an emergency operation. Mrs. Laird, the floor nurse, also left the room. Within a brief period of time, alarmed by the appearance of her patient, Mrs. Powell took her blood pressure and found that it had dropped to the alarming range of 60 over 50, whereupon she immediately rang for assistance. Mrs. Laird responded to the call and upon being advised of the situation, ran out of the room and down the corridor to the nurses' station at the end of the hall where she fortunately found Dr. Ilgenfritz engaged in writing the orders for the release of the patient whom he had just visited. The doctor hurried to Mrs. Prack's room, observed her appearance, found her pulse weak, her respiration slow, and requested Mrs. Laird to immediately contact Dr. Marsh and ask him to bring an oxygen pressure machine. Mrs. Laird communicated with one of the nurses in the operating room; was told that Dr. Marsh said he could not leave at that time and was instructed to give Mrs. Prack an injection of ephedrine sulfate. Dr. Ilgenfritz, having tried external cardiac massage without appreciable effect, left Mrs. Prack's room, ran up the steps to the fourth floor to the door of the operating room and urged Dr. Marsh to bring the pressure oxygen machine immediately. Dr. Marsh responded that he was unable to leave at that time and advised Dr. Ilgenfritz to see if a nurse anesthetist was present on the fourth floor. Dr. Ilgenfritz, unable to find an anesthetist, started back down the stairway to the third floor, again urging Dr. Marsh to bring his oxygen machine. Upon returning to Room 325 Dr. Ilgenfritz administered the ephedrine by hypodermic, inquired if Mrs. Prack's bed would go on the elevator, and, receiving an affirmative reply, immediately began moving the bed out of the room, assisted by Mrs. Laird and Mrs. Powell, down the hall and into the elevator. Mrs. Laird ran up the stairs to the fourth floor in an effort to secure the immediate descent of the elevator and found that Dr. Marsh was just entering the elevator with the oxygen pressure machine. The elevator descended to the third floor, the door opened, Mrs. Prack's bed was pushed into the elevator, Dr. Marsh intubated her and began the administration of 100% oxygen under pressure. At or about this time, in the opinion of Dr. Ilgenfritz, Mrs. Prack's pulse and respiration had ceased to be discernible. When the elevator reached the fourth floor the bed was immediately pushed into the operating room, Dr. Ilgenfritz removed his coat, pulled on a pair of sterile gloves handed to him by a nurse, took a sterile knife from another nurse and proceeded to perform a thoracotomy, opening Mrs. Prack's chest for the purpose of administering direct or internal cardiac massage. The patient's heart began to respond to the massage in a few seconds, and, after the doctor continued the massage for a short period of time in order to be assured that there would not be a recurrence of cessation of the heartbeat, the organ resumed its function, which was continued without further necessity for manual manipulation. The chest incision was covered with a dressing soaked in a saline solution and left open for approximately an hour in order that internal massage might be resumed if it became necessary. During this period a heart specialist, who had been called in consultation, arrived in the operating room but was unable to suggest any further effective procedure, though he continued his observation of the patient for a substantial period of time. Mrs. Prack remained in the operating room until about 6:15 o'clock the following morning, at which time she was returned to her room. During this time she had been attended by Drs. Ilgenfritz and Marsh. Later in the morning she was examined by a neurosurgeon, *174 Dr. Boykin, who was called in consultation, and again by the heart specialist, Dr. Tucker.
Mrs. Prack never recovered consciousness and was completely incapable of the normal exercise of any bodily function. On October 28th she was removed from the Physicians & Surgeons Hospital to Confederate Memorial Medical Center, where she remained, with the exception of a brief period when she was transported by plane to the Sealy Hospital in Galveston for examination, until death occurred on July 6, 1961.
Plaintiff's petition alleged that the decedent suffered a cerebral anoxemia due to a cardiac arrest immediately following surgery and that her condition and eventual death were caused by the negligence and carelessness of the hospital, the attending surgeon and the anesthesiologist. The specific allegations of negligence are summarized as follows:
(1). As against the Physicians & Surgeons Hospital in failing to provide a recovery room and the necessary equipment in connection with the operation;
(2). As against Drs. Ilgenfritz and Marsh in (a) administering an overdose of anesthetic which caused cerebral anoxemia and a myocardial collapse and shock; (b) in removing the patient from the operating room before she regained her normal faculties and recovered from the effect of the anesthetic; (c) in failing to give the necessary care, attention and supervision to the patient after her removal to her room, and (d) in failing to provide the equipment required to meet the emergency that occurred, specifically, a cardiac arrest tray, endotracheal tube and a laryngoscope.
(3). As against Dr. Ilgenfritz in that he failed to equip hospital room 325 with the necessary recovery equipment in accordance with his alleged agreement with and representation to the plaintiff, Russell E. Prack.
(4). As against the hospital and the two doctors named, jointly and severally, in the failure to exercise the degree of care commensurate with the circumstances.
As above noted, appellant contends before this court that the judgment appealed from was manifestly erroneous for the reason that the evidence preponderates in support of the conclusion that each of the parties charged was guilty of negligence.
We find no support for the charge of negligence against the hospital. Plaintiff tendered as his witness Mr. J. W. Gallaspy, business administrator of the Physicians & Surgeons Hospital. It was the uncontroverted testimony of this witness, supported by the testimony of medical experts practicing in the several private hospitals in the City of Shreveport, that according to the general practice patients are not admitted to a recovery room after 3:00 o'clock, P.M. and that recovery rooms are closed at 4:00 o'clock, P.M. The primary purpose of a recovery room is to permit special care and attention, for the benefit of operative cases, within a concentrated area of a hospital by trained personnel. This special attention would not otherwise be available to all operative cases, specifically because of the shortage of trained nursing personnel. With reference to the instant case it is pertinent to note that the same result was accomplished through the attendance of a special registered nurse whose services were made available for private duty with Mrs. Prack and who was ready and waiting to attend her immediately upon her return from the operating room. The same practice is followed in all hospitals in the City with the exception of the Confederate Memorial Medical Center which maintains a recovery room available for use at all hours. It is fair to conclude, *175 upon the basis of the testimony, that this practice is followed by this state-supported institution because of the large numbers of emergency cases that require special attention and care at any and all hours of the day or night.
Nor does the record sustain the charge of failure to provide necessary equipment. Room 325 to which Mrs. Prack was taken following the operation was equipped with a tank of oxygen and a suction pump, both of which were placed in use immediately upon her return to the room. The record fails to justify a conclusion that under the factual circumstances there was any negligence or lack of care in failure to provide additional equipment. In this connection it is pertinent to comment that the only instrument which became absolutely necessary was a machine for the administration of oxygen under pressure which would not have been available in the recovery room and which, in any event, could be used only by a trained anesihetist or anesthesiologist.
Proceeding to a consideration of the charges of negligence against Drs. Ilgenfritz and Marsh, we not only fail to find justification for the contention that the evidence preponderates in support of these charges, but after our painstaking examination of the voluminous record, we are firmly convinced that there is not the slightest support for a finding of negligence in any respect. There was no indication as to any reasonable possibility, much less probability, of the development of the condition which brought about the tragic result. According to the testimony of all the medical experts the occurrence of cardiac arrest is rare, and in this case was an unexpected, indeed, an unforeseeable development. There is not the slightest ground for a belief that Mrs. Prack's condition following the operation indicated anything except a normal recovery from the anesthetic. The testimony as to her reflexes and reactions clearly appearing to indicate returning consciousness is uncontroverted. Despite the fact that repeated examinations of the patient had been made, numerous X-rays had been taken and she had been under observation of the attending physician during her three-day stay in the hospital prior to the operation, there is no evidence of the existence of any physical condition which would have indicated the probability of the sudden drop in blood pressure and the resulting malfunction of the heart. The anesthesiologist accompanied the patient to her room following the operation and performed the necessary services in providing for the administration of oxygen and the use of suction for the relief of abdominal pressure. We are aware of the arguments advanced before this court that the choice of cyclopropane as the principal anesthetic agent was evidence of negligence. We can only comment that this is a bare assumption, completely unsupported and totally unsubstantiated by any factual evidence whatsoever. It is true that in his examination of the witnesses on trial counsel for plaintiff injected the suggestion that the use of this anesthetic had been discontinued in some hospitals but the record is void of any word which would justify the conclusion that this discontinuance was the result of some danger inherent in the anesthetic itself. Additionally, it should be observed that Mrs. Prack had undergone an abdominal operation in 1958, at which time the same anestheticcyclopropane had been used without any ill effects.
The above observations could well be repeated as the basis for the rejection of the charges of negligence or lack of care against Dr. Ilgenfritz. Counsel appears to take the position that the doctor should have done something which he failed to do or that he should have taken some action more promptly, but just what acts should have been performed were not established. Contrary to the import of the arguments advanced, we are of the opinion that without the prompt, efficient and professionally expert ministrations of Dr. Ilgenfritz the patient might have died within a few minutes. It is superfluous to express the opinion that under the circumstances such a *176 result might well have been considered a blessing in disguise. It is only necessary to add the observation that plaintiff failed to establish any agreement on the part of Dr. Ilgenfritz to equip Mrs. Prack's private room as a recovery room. From plaintiff's testimony it appears that this was his understanding but such an agreement was denied by Dr. Ilgenfritz. Again it may be pointed out that the only item of equipment which subsequently proved to be essential would not have been available even in the recovery room, nor would there have been anyone to operate the instrument.
There are some elements involved in the factual circumstances of this case which are more speculative than real. One of these is the application of the so-called "four minute" rule or principle which indicates that in cases of anoxemia or cardiac arrest circulation must be restored, that is, the pumping of the heart must be induced within a period of four minutes following cessation of the natural heartbeat, circulation and respiration, or irreparable brain and physical damage will result. The testimony on this point was more or less academic in nature, and, understandably so, in view of the impossibility of establishing a scientific basis for a conclusion. In this case the heartbeat was restored by the thoracotomy within the allotted period of time, and, nevertheless, the damage resulted. It was the uniform testimony of the expert medical witnesses that a thoracotomy is the approved procedure after the heart stops and within four minutes following this development. It is conclusively established that these requirements were meticulously complied with in the instant case.
Another of the factors relates to the cause of the cardiac arrest. The testimony of the expert witnesses enumerates a number of possible causesa reaction to certain drugs, an overdose of drugs, a stroke, a heart attack, a pulmonary embolism. Not one of these causes nor any combination thereof is established by the record in this case. In this connection there is one fact of some significance which we omitted from our detailed recital. The plaintiff himself testified that when he entered his wife's room after Dr. Marsh left the room:
"She suddenly stopped breathing and she tore her eyes wide open and collapsed her head on the left side and her left arm turned very blue."
In response to questions as to the possible significance of this incident, which apparently only the plaintiff observed, the medical experts testified that it could only be regarded as the occurrence of some dramatic and catastrophic development, such as a stroke or embolism.
Counsel for appellant indicated in argument and brief that some inferences should be drawn from Mrs. Prack's fear and apprehension with reference to undergoing an anesthetic. However, counsel has not suggested what duty of care was omitted except by implication that the doctors involved should have taken some action to allay the patient's anxiety. It was frankly conceded not only by the doctors who attended Mrs. Prack but by the other expert medical witnesses that fear of the effect of an anesthetic or of undergoing an operative procedure is not desirable but no definite procedure is suggested which would have served to alleviate this condition. It must be considered that the operation in this case involved the issue of life or death and both the patient and her husband had consented. At the time the anesthesiologist visited the patient in her room she was already under the influence of pre-operative medication. Finally, it is pertinent to observe that the record fails to establish any relationship between the patient's fear and anxiety and the unfortunate post-operative complications which eventually resulted in death.
The rule as to the degree of care which must be exercised by medical practitioners is clearly stated in Meyer v. St. *177 Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781:
"* * * [T]he law only exacts of physicians, surgeons and dentists that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them."
The opinion in the cited case further stated that a defendant in a malpractice action is not charged with the burden of showing the cause of the occurrence which gave rise to injury and damage.
In the instant case the record is completely devoid of any evidence which would indicate that the parties involved failed to use the degree of skill, care, attention, diligence and judgment commensurate with the standards of the community in which the incident occurred. Indeed, the testimony of the expert medical witnesses uniformly supports the conclusion that the patient received a degree of skill and care which comports with the highest standards and the approved procedure of the medical profession without limitation to a particular locality or community.
Appellants specify negligence against Dr. Marsh on the ground that he scheduled another operation which had the effect of preventing him giving immediate attention to Mrs. Prack. We find no merit in the asserted conclusion of negligence on this point. As we have observed above, there was not the slightest indication of any development in Mrs. Prack's condition which would have required Dr. Marsh's continued attention. It is a matter of common knowledge that doctors successively give their attention to one patient after another and in those instances where there is no probability of the occurrence of an emergency it would be entirely unreasonable to expect a doctor to deny his attention to a patient in need simply upon the basis that another patient might possibly develop a condition which required emergency attention. In the instant case, under ordinary circumstances, if Dr. Marsh had not been committed to give his services in connection with another operation, he might very well have left the hospital, in which case his availability would have been even more remote than under the established circumstances of this case.
To sum up our conclusion upon the basis of the record before us, we not only find no manifest error, but, in our opinion, the verdict of the jury and the judgment responsive thereto are eminently justified.
Finally, we take note of the only legal issue which is presented, namely, the contention that the doctrine of res ipsa loquitur is applicable to the instant facts. We deem it unnecessary to devote any detailed attention to this point or to belabor detailed explanations of the several grounds which would support the inapplicability of the doctrine inasmuch as the application would in nowise benefit the appellant. Even if the principle should be applied, it is abundantly clear that the burden of proof thereby placed upon the defendants has been more than adequately assumed and discharged.
For the reasons assigned the judgment appealed from is affirmed at appellants' cost.