ELLIS, Judge.
This is a medical malpractice case, brought by Mr. and Mrs. Albert LeMay, Jr., for the death of their minor daughter during the performance of a tonsillectomy on her by Dr. William L. Travis. Defendants herein are General Accident Fire & Life Assurance Corporation, Ltd., Dr. Travis’s professional liability insurer, and Argonaut Southwest Insurance Company, liability insurer of Seventh Ward General Hospital, where the operation was performed, and which was the employer of Mary Margaret Forrest Mixon, the anesthetist during the operation. General Accident, by third party petition, asked for judgment against Argonaut and Mrs. Mixon for whatever amounts it might be condemned to pay.
Judgment was rendered in favor of plaintiffs and against General Accident for $25,750.00, and dismissing the suit as to Argonaut. No mention is made of the third party petition, and we assume it was denied by the trial court. From that judgment, General Accident has taken a suspensive *715 appeal, and plaintiffs have appealed from that part thereof dismissing their suit as to Argonaut.
Plaintiffs’ daughter was brought to Seventh Ward General Hospital to have her tonsils removed by Dr. Travis, who is a general surgeon. When she was brought to the operating room, she was first put to sleep by Mrs. Mixon, who then attempted to insert an endotracheal tube into her throat. The endotracheal tube is introduced through the mouth of the patient and is inserted between the vocal cords, which lie at the top of the trachea' — the main air passage to the lungs. When properly introduced, it must fit tightly in the trachea, so that air can pass freely through the tube but none can escape between it and the walls of the trachea. After it is properly inserted, the patient is said to be “intubated”. The tube is then connected to the anesthesia machine, which, under the control of the anesthetist, furnishes a mixture of oxygen and anesthetic to the lungs of the patient. In the line between the machine and the patient is a large air bag, which inflates and deflates as the patient breathes. The anesthetist can observe the respiration of the patient by sight, and by keeping her hand on the bag. By squeezing the bag, the anesthetist can assist the patient’s breathing.
During the operation, the anesthetist sits at the patient’s head, and monitors her pulse, respiration, and blood pressure. These are recorded at five minute intervals on a chart. If the patient should stop breathing, the anesthetist can breathe for the patient by squeezing the bag periodically. If the endotracheal tube is properly in place, the anesthetist can feel a certain amount of resistance when the bag is squeezed. However, if the tube becomes dislodged or is improperly inserted, the anesthetist can feel no resistance when the bag is squeezed.
When the patient’s blood is properly supplied with oxygen, it appears bright red. If it does not receive sufficient oxygen, it becomes darker in color, until it appears to be almost black. The blood can be deprived of oxygen either because there is no air coming into the lungs (anoxia) or an insufficient supply thereof (hypoxia), or because the blood has stopped circulating through the lungs. The latter condition occurs when the heart stops beating, which is known as cardiac arrest.
In this case, the patient was intubated by Mrs. Mixon after some difficulty, and the operation began at about 7:30 a. m. Her pulse, blood pressure and respiration, as recorded by Mrs. Mixon, were within normal limits as of 7:40 a. m. At or shortly after that time, Dr. Travis removed the first tonsil and turned away from the patient to place it on a tray. He then picked up a tonsil sponge, to staunch the bleeding at the site of the wound. When he turned back, he noticed that the blood in the patient’s throat had turned dark purple or black. At the same moment, Mrs. Mixon noticed that the bag was not inflating properly, and felt no pressure when she squeezed it. She testified that she announced this fact out loud. Dr. Travis aspirated the blood from the throat and saw that the endotracheal tube was out. He applied the sponge to the wound and administered pure oxygen by means of a nose mask. He stated that when the mask was applied, he could hear oxygen rushing into the lungs, indicating an open air passage thereto. He then began artificial respiration by means of external cardiac massage, and ordered the administration of various drugs. From the time Dr. Travis turned away to put down the tonsil until the beginning of artificial respiration, no more than thirty to forty seconds elapsed. He also summoned a Dr. Lobue, a pediatrician, to assist him.
Dr. Lobue arrived fifteen or twenty minutes later, and helped Dr. Travis with various emergency procedures. Despite their efforts, plaintiffs’ daughter was pronounced dead at 8:20 a. m. She had not responded to any of the procedures employed. Although Mrs. Mixon made a *716 number of attempts, she was not able to reinsert the endotracheal tube. However, she said that she was able to “ventilate” the patient with the nose mask, throughout the existence of the emergency.
The immediate cause of death was reported by Dr. A. Hunt, who performed the autopsy, as being a massive pulmonary edema, which means that the lungs had filled with fluid. He stated that this condition could result from anoxia, hypoxia, or from cardiac arrest. He further testified that pulmonary edema is an anatomic finding, and that it must have resulted from the anesthesia, the problem of the endo-tracheal tube, or from cardiac arrest. His opinion is best summed up in the following testimony:
“A. Well, I would conclude again that the anatomic cause of death or the anatomic manifestation was acute pulmonary edema and that the physiologic and clinical conditions surrounding this involved either difficulties with the tube and/or dosage of anesthesia and/or anoxia related to either one of those.
“BY THE COURT:
“Q. Just as an ordinary fellow up here, could I say that the absence of the endo-tracheal tube set up the conditions that subsequently resulted in her death?
“A. Yes, sir, I think that is a distinct possibility, although I can’t say with 100 degrees assuredness that the child did not have cardiac arrest before the tube came out. I just have an anatomic finding and these clinical findings.”
Dr. Travis was of the opinion that the difficulty was caused by lack of blood circulation due to cardiac arrest, and that the procedures which he followed were based on that assumption. Dr. Lobue concurred in Dr. Travis’s opinion, and testified that the procedures followed were proper.
Dr. Travis also testified that in his opinion the tube came out when the patient’s body relaxed following the cardiac arrest.
It is plaintiffs’ position that the endo-tracheal tube was the only adequate means of getting oxygen to the patient’s lungs. They allege that the negligence of both Dr. Travis and Mrs. Mixon was in failing to note when the tube came out, and in failing to reinsert it immediately, and that anoxia resulted therefrom, causing the pulmonary edema from which the patient died.
The trial judge found that the death was due solely to the negligence of Dr. Travis in failing to use due care, in that he failed to see the tube come out and failed to reinsert it immediately. He was of the opinion that Mrs. Mixon was not negligent, since both she and Dr. Travis testified that the tube was properly inserted at the beginning of the operation.
The law applicable to the case is as follows:
“A physician, surgeon or dentist, according to the jurispudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case.
“The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where
*717 such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence.” Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954).
There is not one word of testimony in this case to the effect that the course of action followed by Dr. Travis was not up to the standerd of practice in the community. Dr. Lobue testified that Dr. Travis met that standard, and so did Dr. Travis. Dr. Hunt, the pathologist, did not testify on that point.
The burden of proof is on the physician to show that he meets the standard, and, in the absence of evidence to the contrary, we must find that Dr. Travis has done so.
Plaintiff also seeks the benefit of the doctrine of res ipsa loquitur, relying on the following language in the case of Meyer v. St. Paul-Mercury Indemnity Co., 61 So.2d 901, 905 (La.App.Orl.1952) :
“We have no doubt at all that the doctrine of res ipsa loquitur has no application where, in the ordinary suit against a physician, a surgeon, or a dentist for malpractice, all that is shown is that the desired result was not accomplished. On the other hand, however, we think that where the complaint is not based on the failure to obtain satisfactory results, but is based on the charge that, during the rendering of the professional services, there occurred some untoward event, or some omission or act from which there resulted something not ordinarily found to result during such treatment or operation, the physician, or the surgeon, or the dentist may be required to show that such unusual occurrence did not result from negligence on his part.”
This language was neither expressly adopted nor rejected in the Supreme Court decision in the same case, supra. It has, however, been reiterated in a number of cases by the Courts of Appeal, although the doctrine has not been applied. See Dyess v. Caraway, 190 So.2d 666 (La.App. 2nd Cir. 1966); Herbert v. Travelers Indemnity Company, 193 So.2d 330 (La.App. 4th Cir. 1967); Britt v. Travelers Indemnity Company, 205 So.2d 880 (La.App. 4th Cir. 1968). The doctrine of res ipsa loquitur has also been found inapplicable to medical malpractice cases. See Foster v. St. Paul Fire & Marine Insurance Co., 212 So.2d 729 (La.App. 4th Cir. 1968).
The “untoward event” alleged by plaintiffs here is the dislodgment of the endo-tracheal tube, and the “omission to act” the failure of the physician to reinsert it.
If the res ipsa loquitur is applicable, Dr. Travis must show that the dislodgment of the tube was not due to his negligent act, and that the death did not result therefrom, or from his failure to reinsert the tube.
It is apparent from the testimony that there existed a clear air passage to the patient’s lungs after the tube was dislodged, and that oxygen was furnished to the lungs via a nose mask within fifteen to twenty seconds of the moment the dark blood was discovered. Oxygen was furnished in that manner until the patient was declared dead. Dr. Travis, Dr. Lobue, and Mrs. Mixon all testified to that fact. There is no evidence in the case indicating that reintroduction of the tube, or reintubation, would have led to a different result.
If res ipsa loquitur is applicable to such a case as this, Dr. Travis has satisfactorily discharged the burden of proof imposed on him thereby.
With respect to Mrs. Mixon, we need not consider whether she has discharged her burden of proof under the doctrine of res ipsa loquitur, since the appeal from that part of the judgment dismissing her insurer from the case was not perfected, the bond having been filed on February 28, 1969, over six months after the expiration of delays for a new trial.
*718 The judgment appealed from is reversed and there will be judgment herein in favor of defendants and against plaintiffs dismissing plaintiffs’ suit at their cost.
Reversed and rendered.