SARTAIN, Judge.
This is a medical malpractice suit for an injury allegedly received by plaintiff Sims during or immediately following a kidney stone operation performed on him by Dr. Mortimer Silvey. Also named as defendants were Dr. E. Edward McCool, Jr., who assisted in the surgery, Dr. L. Ben Kirby, the anesthesiologist, the Baton Rouge Gen *395 eral Hospital, and the respective liability-insurers, St. Paul Fire and Marine Insurance Company for Drs. Silvey and McCool, Insurance Company of North America for Dr. Kirby and Argonaut Southwest Insurance Company for the Baton Rouge General. The hospital was dismissed from the suit on a motion for summary judgment based on the doctrine of charitable immunity.
Plaintiff alleged that he suffered an ulnar neuropathy in his right arm, i. e., organic damage in his ulnar nerve at the point where the nerve crosses the elbow and which is commonly known as the “funny bone”. The medical experts who testified said that the terms neuropathy and neuritis are not synonymous but are sometimes carelessly used interchangeably. A neu-ropathy is more severe and the term should be used to describe organic nerve damage with pain and other symptoms in a localized area. A neuritis means nerve irritation and is characterized by more generalized pain, tingling or numbness.
The trial judge found that the plaintiff did “suffer a neuritis or a neuropathy at some time after he entered” the hospital in June of 1967, but that the plaintiff did not prove the cause thereof or any negligence on the part of the hospital employees or the physicians involved. The judge further found that the plaintiff failed to prove that the physicians did not possess the requisite skill or that the treatment given did not meet the standard of medical care in the community.
We affirm the judgment of the lower court dismissing plaintiff’s suit as to all defendants.
Plaintiff contends on appeal that the trial judge erred in placing the burden of proof on the plaintiff and that the doctrine of res ipsa loquitur should be applied. Inasmuch as he entered into surgery without pain in his right arm and such pain had developed by the time he regained full consciousness thereafter, he argues that he cannot be called upon to explain what happened during the time he was unconscious or under the influence of drugs and sedatives.
The record reveals that the operation itself (medically a ureterolithotomy) for the removal of the kidney stone was a complete success from a urological standpoint. The procedure took forty-five minutes “from skin to skin” and all of the medical experts agreed that the positioning of the patient and surgical technique of Dr. Silvey were proper. All three defendant physicians testified that no one struck or leaned on Sims and that he did not roll over or fall off the operating table. Since the kidney stone was located in the right ureter, Sims had been positioned with his left side down and right arm hanging limply up and away from the area of the incision in the right flank. No expert could suggest any way in which the right ulnar nerve could have been traumatized or injured in that position during the course of the operation. Drs. McCool and Kirby were only involved with Mr. Sims for that forty-five minute period and clearly there is nothing in the record to indicate negligence or lack of care on their part or even that the injury complained of could have occurred at that time.
Since Dr. Silvey’s connection with the plaintiff included both pre-operative and post-operative care, it is important to review the plaintiff’s medical history prior to, during and Jollowing his hospitalization from June 5 to June 23, 1967, for the kidney stone operation.
Sims had a history of heart trouble and for a period of several years had been treated by Dr. Richard Selser, a specialist in internal medicine and cardiology. He had been hospitalized by Dr. Selser about two months prior to his operation for chest and arm pain. At that time Sims was started on anticoagulants and vasodilators to increase the efficiency of his circulatory system and the pains were resolved. When the kidney ailment began to develop, Dr. Selser referred Sims to Dr. Silvey, an ex *396 pert in urology. X-rays revealed the presence of a particle partially obstructing the right ureter. Other tests showed a dual bacteria infection. Because of the previous heart trouble, it was agreed that conservative treatment would be best, based on the possibility that the kidney stone might move on through the ureter spontaneously and without requiring surgery. After several days, the stone had not moved and Dr. Silvey recommended surgery. The anticoagulants were stopped and treatment was commenced with Vitamin K and other drugs used to increase the clotting characteristic of blood in preparation for the operation on June 12.
On June 14, Dr. Silvey made a note in the hospital records that Sims had had no untoward reaction from surgery and was doing well although he had been given several shots of morphine and Demorol periodically. Sims testified that he had awakened after surgery experiencing pain in his right flank and very severe pain in his right arm, that he complained to anyone who would listen but nothing was done for him. However, he admitted that he was unable to say with certainty whether he was fully conscious on the first, second or third day following surgery. Dr. Selser and Dr. Silvey testified that they were very much concerned about the possible post-operative complications due to the prior history of heart trouble and that Sims made no complaint of pain except in the right flank until the 16th or 17th of June when he complained of pain in his chest and both arms. (No note appeared in the nurses’ records until June 19 when Sims was given a shot for pain in both arms.)
On June 17 or 18, Dr. Silvey called Dr. Selser, the cardiologist, in for consultation on the complaints of chest and arm pain and Dr. Selser testified that his first concern was that Sims might be having a coronary thrombosis. This was ruled out by tests and Dr. Selser then thought the problem was due either to a coronary insufficiency or a generalized neuritis or a combination of the two. He thought the symptoms were similar to those for which Sims had been hospitalized two months earlier and in any event were not nearly so severe as the pains which developed later in the summer when the ulnar neuropathy was diagnosed. It was felt that the renewed treatment with anticoagulants and vasodilators would resolve the condition and Sims was discharged on June 23.
Sims said that his pain continued and on July 12 he was examined by a neurologist, Dr. Edelman, who made no positive diagnosis and prescribed physiotherapy.
On July 28, Sims entered Our Lady of the Lake Hospital with hypertension, nausea and arm pain. Dr. John Hopper, a neurosurgeon, took his history on the 28th and on July 31 examined Sims and diagnosed the right ulnar neuropathy. He testified that Sims told him of severe arm and shoulder pain after seeing Dr. Edelman and after his first physiotherapy.
On August 18, Sims entered the Ochsner Clinic in New Orleans for a hyperpara-thyroid condition which necessitated an operation for the removal of adenomas from the parathyroid gland. On August 25, Dr. Homer Kirgis, a neurosurgeon also examined Sims and felt that a transplant of the right ulnar nerve could be performed at the same time the primary operation was being done, although otherwise he felt the condition might resolve without surgery. The transplant was done and Sims gradually recovered. Dr. Kirgis found during surgery that Sims had a shallow groove in his right elbow which caused the nerve to pass superficially across it and to be more exposed than is normally the case.
There was much speculation during the trial about possible causes of an ulnar neu-ropathy. It was agreed that trauma, such as a sharp blow, or sustained pressure on the nerve could be responsible. Such an injury could be caused by propping one’s *397 self up on the elbows in bed or on the arms of a chair for a long period of time. A circulatory insufficiency could also cause the degeneration of such a peripheral nerve.
No expert who had examined the records of the Baton Rouge General and who had heard the testimony of Drs. Silvey, McCool and Selser could say that the neu-ropathy in fact occurred during that time. Dr. Selser was emphatic in stating that, at most, a generalized neuritis of the chest and upper extremities was indicated and was probably combined with a coronary insufficiency.
All medical experts agreed that Dr. Sil-vey was a skilled urologist and had met the standard of medical care in the Baton Rouge community. They also agreed that he used good judgment in notifying Dr. Selser, the cardiologist and internal medicine specialist, about the chest and arm pain.
There was no evidence to indicate any accident or untoward event or to indicate any negligent act or omission by any defendant which could have caused the injury complained of by Sims.
Our review of the jurisprudence in this area of medical malpractice reveals that a physician is required only to show that he possesses the degree of skill ordinarily employed by the members of his profession in the same community and that he used reasonable care and diligence, along with his best judgment, in applying that skill. Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966); Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954); LeMay v. General Accident Fire and Life Assurance Corporation, 228 So.2d 713 (1st La.App., 1969); and cases therein cited.
For the above reasons, the judgment of the lower court is affirmed at plaintiff-appellant’s costs.
Affirmed.