264 So.2d 756 (1972)
Leo BUTLER et al.
v.
TRAVELERS INSURANCE CO. et al.
No. 8895.
Court of Appeal of Louisiana, First Circuit.
June 26, 1972.
Rehearing Denied July 28, 1972.
*757 Robert Vandaworker, Taylor, Porter, Brooks & Phillips, Baton Rouge, for defendant-appellee Dr. Wm. Smith and Travelers.
Bryant W. Conway, Baker, for appellant.
Donald S. Zuber, Seale, Smith & Phelps, Baton Rouge, for defendant-appellee Dr. William C. Dunbar and Insurer, American Ins. Co.
Before LOTTINGER, SARTAIN and ELLIS, JJ.
SARTAIN, Judge.
This suit, before us for the third time, seeks damages for injuries sustained by Lilly Mae Wade Butler which were allegedly caused by the medical malpractice of Drs. William E. Smith and William C. Dunbar. She was joined as a plaintiff herein by her husband, Leo Butler, at the time of the original filing of this action, although his whereabouts are now unknown; also named as defendants are The Travelers Insurance Company and the American Insurance Company, the liability insurers of Drs. Smith and Dunbar, respectively. This appeal is taken by the plaintiffs from an adverse judgment rendered subsequent to trial on the merits.
The petition initiating this protracted litigation was filed on April 9, 1963, and states essentially that Lilly Butler contracted tetanus as a result of improper treatment by the named physicians. The allegations claimed that on May 7, 1962, the petitioner suffered a cut on her knee for which she was treated at Our Lady of The Lake Hospital in Baton Rouge by Drs. Smith and Dunbar. During that treatment, a tetanus vaccination history was obtained from the patient but that improper treatment was given in view of the history which she supplied them, and that by May 17, 1962, she had contracted a serious and extensive case of tetanus for which she was hospitalized some fifty-seven days, was subjected to additional surgery, and during which she remained in a coma for ten days, for all of which she is entitled to recover from the defendants.
The petition was amended on March 30, 1965, to include as defendants Parke, Davis & Co. and Wythe Laboratories, Division of American Home Products Corporation, manufacturers of the tetanus toxoid and penicillin preparations which were given to Mrs. Butler by Dr. Dunbar, that amending petition alleging breach of warranty on the part of these manufacturers. Motions for summary judgment were sustained as to Parke, Davis and Wythe in the district court and, on appeal, we affirmed those decisions. See Butler v. Travelers Insurance Company, 202 So.2d 354 (La.App., 1st Cir. 1967).
*758 On May 21, 1969, the plaintiffs again amended their petition to allege certain other acts and omissions by these physicians and to amend their original prayer for damages to a greater amount. Thereafter, motions for summary judgment were filed by the defendants presently before us. These motions were sustained by the trial judge, but were reversed by this court and trial on the merits ordered. See Butler v. Travelers Insurance Co., 233 So.2d 271 (La.App., 1st Cir. 1970). As previously indicated, that trial resulted in a judgment for the defendants and the dismissal of plaintiffs suit. We affirm that judgment.
In written reasons for judgment, the district judge correctly stated the jurisprudential rules which are applicable to the case at bar, as stated by the Supreme Court in Meyer v. St. PaulMercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953) as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule, it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case." (Extensive citations omitted.)
This court has consistently adhered to that doctrine. See Sims v. Silvey, 246 So.2d 394 (La.App., 1st Cir. 1971) and authorities cited therein.
Nor does the undertaking physician guarantee a cure. As was pointed out by the Supreme Court in Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35 (1963):
"We think the general rule universally obtaining on the subject matter is that: `When a physician undertakes the treatment, of a case he does not guarantee a cure, nor is any promise to effect a cure or even a partial healing to be implied, nor does the law raise from the fact of employment an implied undertaking to cure, but only an undertaking to use ordinary skill and care. For this reason a physician cannot be held up to a standard of civil responsibility similar to that of engineers, mechanics, and shipbuilders. Of course a physician might contract specifically to cure and he would be liable on his contract for failure, but, in the absence of such a special and peculiar contract, the fact that treatment has resulted unfavorably does not even raise a presumption of want of proper care, skill, or diligence. * * *'" 21 R.C.L. Sec. 36 p. 391. Also, see 70 C.J. S. Physicians and Surgeons § 57, pp. 981, 982:
"A dentist, like a physician or surgeon, is not an insurer or guarantor of results, in the absence of express agreement." 41 Am.Jur., Physicians and Surgeons, Sec. 104, p. 219.
An examination of this case, in view of these well established principles of law, compels the conclusion that the plaintiffs' case is totally without merit. That approximately 11:30 o'clock p. m. on the evening of May 7, 1962, Lilly Mae Wade Butler, a twenty-seven year old colored female, was admitted to the emergency room of Our Lady of The Lake Hospital in Baton Rouge, Louisiana, suffering from what was generally described to be a minor cut on her nose and a rather deep cut on her right knee, both of which were sustained as a result of a domestic argument which ensued between her husband and herself. She was initially examined by Dr. William C. Dunbar, a general practitioner at that time, now a specialist in radiology, who described the knee would as a laceration of about two and one-half to three inches in length which was cleanly incised as if it had been done by a sharp object, and which was deep enough to extend into the *759 knee joint. He obtained from her, as best he could, a history of her "lockjaw" immunization and she replied that, to the best of her memory, she believed that she had had one shot when she was about six or seven years old. Dr. Dunbar, thereafter, ordered injections of penicillin and tetanus toxoid and, at that time, called an orthopedic specialist, Dr. William E. Smith, to examine the patient, due to the deep nature of the knee wound. Upon Dr. Smith's arrival at approximately midnight, they again examined the patient and at that time, according to Dr. Smith's testimony, he accepted the patient as his own and became responsible for her further treatment. Dr. Dunbar, subsequent to assisting with the surgery on that evening, did not see the patient again.
Upon arriving from his home on that evening, Dr. Smith confirmed that the injury extended into the knee joint and then ordered that the patient be prepared for surgery, which she underwent some two to three hours later. Complete operating room procedures and preparations were observed antecedent to the surgery itself which included, in addition to the normal anesthetics, two complete sterilizations of the right leg, from midcalf to mid-thigh, and a third sterilization of the area immediately surrounding the wound. According to Dr. Smith, the surgery itself consisted of a complete debridement, or surgical trimming, cleaning and evacuation of the wound; dissection of the wound was performed through the various tissues and linings into the knee joint to remove any skin or other fallen or contaminated matters which would prevent the wound from being completely clean. After a completion of the debridement, the wound was completely inspected, irrigated with sterile salt water as a final cleaning agent, and the wound closed by suturing. Dr. Smith recalled that no visible foreign matter whatsoever remained in the cut and that it was a very clean, open would. He and Dr. Dunbar related that they discussed the implications of tetanus as pertained to this patient but after learning of her history from Dr. Dunbar, Dr. Smith confirmed that he concurred completely with the prescribed anti-tetanus medication which had been previously given.
Dr. Smith saw the plaintiff again on May 9, and on May 11, and on both occasions her condition, and that of the wound, was excellent. He advised her to return one week from the latter date for probable removal of the knee sutures. On May 17, the plaintiff was seen by Dr. Smith's associate, Dr. J. Willard Dowell at the emergency room of the Baton Rouge General Hospital where she had been admitted with complaints that she could not open her mouth completely. She was immediately transferred to Charity Hospital in New Orleans for treatment because of that institution's familiarity with tetanus cases. Although no expert testimony was presented by the plaintiff in support of her case, it appears that the diagnosis there was tetanus for which she was treated over the previously indicated period of time. The plaintiffs' suit for damages is based upon the proposition that proper medical practice was not observed by these two physicians in that they failed to administer to Mrs. Butler injections of serums generally described as tetanus antitoxins to prevent the contraction of this disease. The record is, however, devoid of any professional support for that contention.
The record does indicate that at the time of the plaintiff's mishap, there were two methods then available to counteract this disease; the first, the use of tetanus toxoid which was administered by Dr. Dunbar on that night, and the second, the use of tetanus antitoxins. The former is a means by which the body builds its own defenses to the tetanus toxin but which, admittedly, had minimal short term value and which becomes effective, in time, by the use of booster shots. Tetanus antitoxins, however, do have immediate preventative value but they also expose the patient to great danger from a number of harmful side effects. These harmful reactions are intensified *760 among persons who have had the antitoxin serums on previous occasions.
Drs. Smith and Dunbar related that their decision not to administer tetanus antitoxins in this particular case was for two reasons. The plaintiff's history indicated that she had received a "lockjaw" shot at a time period when only the antitoxins were available to the general public; thus, a second dosage of these, even though several years later, would greatly increase her chances of harmful reaction and possible death, which is a very real probability when a patient reacts adversely to the antitoxins.
Secondly, the wound was clean and of the type where tetanus would least likely result. They surmised that under the circumstances of the case, and in view of the low incidence rate of tetanus, that proper cleaning, the use of penicillin, and the prompt administering of the tetanus toxoid was proper. Dr. Dunbar related that in eight years of general practice, he never administered tetanus antitoxins and Dr. Smith also verified many extremely bad experiences with the use of that medication. Both confirmed that the patient received not only care commensurate with the community standard, but the best that could be provided at that time.
They were supported in these conclusions by the testimony, by deposition, of Dr. Richard A. Faust of New Orleans, who is recognized as a leading authority on the disease. He unequivocally stated that the care which Mrs. Butler received was better than that recognized in the community and that their procedures and precautions were exactly those that he would have followed or recommended under the circumstances. He verified that the type of wound which Mrs. Butler sustained was one which was unconductive to the production of tetanus and that the chances for contraction of this disease by her under the circumstances were, indeed, as small as one in ten million. He further confirmed that the use of tetanus antitoxins, called for under only the most extreme conditions, which were not present here, and that if they had been so administered under these circumstances, that this would have itself amount to medical malpractice.
We note here, as did the trial judge, the absence of expert medical testimony which would support plaintiff's assertions of malpractice on the part of the attending physicians. Rather, plaintiff has sought to base her case on technical articles on the subject of tetanus and argues that it is not sacramental that one expert testify that another did in fact fail to follow certain prescribed medical procedures. Cited as authority are the cases of Thompson v. Brent, 245 So.2d 751 (4th La.App.1971) and Atkins v. Humes, 110 So.2d 663 (Fla. S.Ct., 1959). In Thompson the experts testified that it was proper procedure to remove a cast with a Styker saw and that a small amount of abrasions could be expected. The trial judge observed the residual scars sustained by plaintiff and determined that the saw itself had been improperly used and found for the plaintiff.
In referring to two malpractice cases which were resolved in plaintiffs' favor without contrary expert medical testimony, the Florida Supreme Court in Atkins stated (110 So.2d 663,666):
"These two decisions are typical of the many malpractice cases involving a charge of negligence based on the careless or unskillful administering of an approved medical treatmentas distinguished from a charge based on an incorrect diagnosis or the adoption of the wrong method of treatmentin which the courts have upheld a judgment for plaintiff or required the submission of the cause to a jury, despite the absence of expert testimony that the acts complained of would amount to bad practice. Obviously, except in rare cases, neither *761 the court nor the jury can or should be permitted to decide, arbitrarily, what is or is not a proper diagnosis or an acceptable method of treatment of a human ailment. Cf. Crovella v. Cochrane, Fla. App., 1958, 102 So.2d 307. But jurors of ordinary intelligence, sense and judgment are, in many cases, capable of reaching a conclusion, without the aid of expert testimony, in a malpractice case involving a charge of negligence in the application or administration of an approved medical treatment. For example, in the exercise of only common sense and ordinary judgment, a jury would have the right to conclude that it is negligence to permit a wound to heal superficially with nearly half a yard of gauze deeply imbedded in the flesh, Walker Hospital v. Pulley, 74 Ind.App. 659, 127 N.E. 559, 128 N.E. 933; to fail to sterilize surgical instruments before performing an operation, Lanier v. Trammell, 1944, 207 Ark. 372, 180 S.W.2d 818; to cut off part of a patient's tongue in removing adenoids, Evans v. Roberts, 172 Iowa 653, 154 N.W. 923; to perforate the urethra in performing an operation in which it was necessary to use care not to do so, Goodwin v. Hertzberg, 1952, 91 U.S.App.D.C. 385, 201 F.2d 204. Many other examples are cited in the annotation in 141 A.L.R. at pp. 12 et seq.; and see the cases cited in Montgomery v. Stary, supra, 84 So.2d [34] at page 40."
In relating the facts and the rules of law announced in the Atkins and Thompson cases to the facts in the case at bar, we do not find that the defendants-physicians either carelessly or unskillfully administered an approved medical treatment, made an improper diagnosis, or adopted a wrong method of treatment.
Accordingly, for the above and foregoing reasons, the judgment of the district court is affirmed at appellant's costs.
Affirmed.