282 So.2d 147 (1973)
Horace Alexander GAGE, Plaintiff and Appellee,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant and Appellant.
No. 4241.
Court of Appeal of Louisiana, Third Circuit.
August 20, 1973.
Dissenting Opinion August 22, 1973.
Rehearings Denied September 14, 1973.
Writs Refused November 9, 1973.
*148 Pugh, Boudreaux & Gachassin by Nicholls Pugh, Jr., Lafayette, for defendant-appellant.
Edwards, Stefanski & Barousse by Homer E. Barousse, Jr., Crowley, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
CULPEPPER, Judge.
This is a medical malpractice case. The radial nerve of plaintiff's right arm was inadvertently severed during surgery by the defendant, Dr. Guy J. Dunning. A jury awarded plaintiff $150,000. The doctor and his insurer appealed.
The substantial issues are: (1) Was the defendant physician negligent? (2) Was the plaintiff contributorily negligent in failing to follow the instructions of his doctors? (3) Did the trial judge commit reversible error in certain evidentiary rulings and/or in a charge to the jury on res ipsa loquitur? (4) Is the award excessive?
GENERAL FACTS
Plaintiff has no education. He has worked most of his life as a laborer on farms and in the oil fields. On March 18, 1969, while working as a roughneck on a drilling rig, he was thrown against some stairs. He sustained a simple fracture of the right humerus at about midshaft. Initially, he was treated by Dr. Tom Curtis, a general practitioner of Rayne, who did a closed reduction and applied a cast. However, the bone did not knit. Five months post-injury, Dr. Curtis referred plaintiff to the defendant, Dr. Guy J. Dunning, an orthopedic surgeon of Lafayette.
On August 24, 1969, Dr. Dunning performed the surgery in question, the general purpose of which was to secure a proper union of the bone by plating and bone grafting. First, an incision was made in the upper arm, and the muscles were spread apart to give access to the bone. A five months' accumulation of scar tissue and callus, between one-quarter and onehalf inch thick, was attached to the bone at the fracture site. This hard callus had to be removed to give a flat surface on the bone to which a metal plate could be attached *149 with screws. Bone chips, taken from the hip, were later placed around the fracture site to aid the bone in healing.
The radial nerve comes out of the body just under the arm pit, and wraps around the front of the humerus near the fracture site. In innervates the muscles that raise the hand and lift the fingers. In this case, the radial nerve was imbedded in the scar tissue and callus. Using an osteotome (an instrument similar to a chisel), Dr. Dunning pushed the sharp edge along the surface of the bone to cut and pry off the callus. He could not see the radial nerve, but knew it was in or under the callus. During this procedure, he noted a jerk of the right arm, which indicated the osteotome had come in contact with the radial nerve. After the callus was removed and turned over, he discovered the nerve had been severed. Following the completion of the plating and bone grafting procedure, the ends of the sheath of the radial nerve were sutured together and the surgery was closed. The expert medical testimony shows that normally nerve fibers will grow back down inside the sheath of the nerve to the muscles which they innervate at the rate of about one inch per month. In this case, complete reinnervation was anticipated in about seven months.
NEGLIGENCE OF DR. DUNNING
Our jurisprudence is established that physicians are not insurers of the results of their treatment. They are not required to exercise the highest degree of skill and care possible. Their duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of their profession in good standing in the same community or locality, and to use reasonable care and diligence, along with their best judgment, in the application of this skill to the case, Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953); Uter v. Bone & Joint Clinic, 249 La. 851, 192 So. 100 (1966); Thibodeaux v. Aetna Casualty & Surety Company, 216 So.2d 314 (La.App. 3rd Cir. 1968); and Sims v. Silvey, 246 So.2d 394 (La.App. 1st Cir. 1971).
We will briefly summarize the expert medical testimony. The defendant, Dr. Dunning, described the surgery, as stated above. He emphasized that since five months had elapsed after the fracture, a large amount of callus had formed, and the nerve was encased in this hard substance, which increased the hazard. Dr. Dunning takes the position that the callus had to be removed, that the risk of injury to the radial nerve had to be taken, that he followed the usual and customary surgical procedures, but inadvertently severed the nerve. He concedes that this had never happened to him before or to any other orthopedic surgeon to his knowledge, but maintains that the occurrence was unavoidable under the circumstances.
Dr. William Louis Meuleman, an orthopedic surgeon of Lafayette, was called by the plaintiff. He agreed the surgical procedure used by Dr. Dunning was proper and that in this operation there is always a risk of injury to the radial nerve. In picturesque language he stated that the radial nerve "is there no matter what time of the day or night and it is one of the things that can get you into trouble whether you want to get into trouble or not." Nevertheless, Dr. Meuleman would not state, despite being pressed to do so by counsel for defendant, that the severance of the nerve was "unavoidable". Furthermore, Dr. Meuleman said he had performed substantially the same surgery several times and had never severed the nerve, and had never heard of any other surgeon doing so.
Dr. Hugh Larriviere, also an orthopedic surgeon of Lafayette, is Dr. Dunning's associate and assisted him during the surgery in question here. His testimony is substantially the same as that of Dr. Dunning, particularly in that he considered injury to the radial nerve to be a normal risk of such surgery, and that in this case the severance of the nerve was unavoidable. However, Dr. Larriviere also testified that *150 he had performed similar surgery several times but had never severed the nerve, and had never heard of any other surgeon doing so.
Dr. Luke Bordelon is also an orthopedic surgeon from the Lafayette area. He stated that Dr. Dunning had used the customary and proper procedure, and that there is always a great risk of injury to the radial nerve. However, like the other physicians who testified, he had never damaged the nerve or heard of any surgeon who had. When asked whether the occurrence was "unavoidable", he compared it to an automobile accident, stating that there is always a chance of a wreck.
Dr. Joseph W. Robertson, a neurological surgeon of Houston, Texas, testified by deposition. Since he is not an orthopedic surgeon, he would express no opinion as to the correctness of the surgical procedure used by Dr. Dunning. But he did say that severance of a radial nerve during the repair of a fractured humerus should not occur, although it is possible. His testimony concerns principally the extent of plaintiff's residual disability, which he estimated to be about 25% of the arm as a whole, based on the weakness of the wrist and fingers.
Summarizing the expert medical testimony, it shows the general procedure used by Dr. Dunning was proper. However, special care must be used to avoid damage to the radial nerve, particularly where it is entrapped in scar tissue or callus. During such surgery, there is always a risk of damaging the radial nerve. However, none of these physicians had ever severed the nerve during such surgery, although each orthopedist had performed this operation several times. Furthermore, none had heard of such an occurrence in the community. All agreed that the severance of the nerve was "inadvertent", but only Dr. Larriviere and Dr. Dunning testified that it was "unavoidable".
Although the issue is close, we cannot say there was insufficient evidence for the jury in its discretion to find as a fact that Dr. Dunning did not exercise the degree of skill ordinarily employed, under similar circumstances, by members of his professional specialty in good standing in the community.
CONTRIBUTORY NEGLIGENCE
Defendants next contend plaintiff was guilty of contributory negligence in failing to follow reasonable and proper instructions by his doctors, Lindsey v. Michigan Mutual Liability Company, 156 So.2d 313 (La.App. 4th Cir. 1963). See also generally 70 C.J.S. Verbo Physicians and Surgeons § 51b, p. 974.
Dr. Dunning testified that following the removal of the cast from plaintiff's arm on about October 20, 1969, physio-therapy under a physician's supervision was prescribed. This therapy was continued through mid-January, 1970, and again for 11 days in February of 1970. But from December 1, 1969 through the middle of February, 1970, it was not under the supervision of a physician. Dr. Dunning testified that on December 1, 1969 plaintiff was instructed to return for therapy on December 8, 1969, but failed to do so. Plaintiff says he took all therapy prescribed.
The expert medical testimony shows that following severance of the radial nerve, physical therapy is customarily prescribed to prevent atrophy of the muscles during the time necessary for their reinnervation. Dr. Meuleman, in particular, explained that the purpose of the physical therapy was not to speed up the regeneration of the nerve fibers but to prevent muscle atrophy. It was Dr. Meuleman's opinion that in this case the failure of the plaintiff to receive physical therapy under the supervision of a physician from February, 1970 until June of 1971, when he took additional therapy under Dr. Robertson, did not have any "real overall effect", because the nerve finally regenerated completely and all muscles are functioning, although there is *151 some atrophy and weakness. But some atrophy would be expected from the five-months period the arm was in a cast before surgery and two months after surgery, and it would be very difficult to estimate whether any of the present residual muscle weakness is the result of plaintiff's failure to take physical therapy treatments after February, 1970.
Viewing the evidence as a whole, there is ample basis for the jury's conclusion that defendants failed to carry their burden of proving plaintiff was guilty of contributory negligence casually related to any present disability.
ERROR BY TRIAL JUDGE IN REFUSING TO ALLOW PHYSICIANS TO GIVE THEIR OPINION AS TO WHETHER DR. DUNNING WAS NEGLIGENT
Dr. Meuleman and Dr. Larriviere were asked to given an opinion as to whether Dr. Dunning used the degree of care and skill ordinarily employed under similar circumstances by members of his profession in good standing in the community. Plaintiff's objection to the question was sustained by the court. A proffer of proof, in the absence of a jury, was taken in which Dr. Larriviere answered the question in the affirmative and stated further that Dr. Dunning was not guilty of malpractice. No proffer of proof was taken as to the testimony of Dr. Meuleman.
Defendant contends the refusal of the trial judge to allow these two physicians to answer the question is reversible error. The issue is whether, in a medical malpractice case, expert medical opinion is admissible upon the ultimate question for determination by the jury. There are several early cases in our jurisprudence which state the general rule that an expert witness is not entitled to give his opinion upon the ultimate question for determination by the jury, Marcy v. Sun Mutual Insurance Company, 11 La.Ann. 748; Bayles v. Jefferson Standard Life Insurance Company, 148 So.2d 465, La.App.; Rickerfor v. New York, 186 So. 109, La.App.; and Westchester Fire Insurance Company of Schilling's Heirs v. Kent Piling Company, 51 So.2d 329, La.App.
It is stated in several general legal texts on evidence that the modern tendency is away from the rule, that it is not inflexible and is subject to many exceptions, 32 C.J. S. Verbo Evidence, § 446b, pp. 63-64; Conrad, Modern Trial Evidence, Section 663; and 7 Wigmore, Evidence, Sections 1917-1929 (3rd Ed. 1940). We find no case from our own Supreme Court which has recognized in medical malpractice cases an exception to the rule. However, in Lauro v. The Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir. 1972), writ of certiorari refused, the court did allow expert medical opinions on the ultimate issue in a malpractice case. The opinion cites Steinberg v. Indemnity Insurance Company of North America, 364 F.2d 266 (5th Cir. 1966), in which the court held:
"Defendant has cited in its brief a number of older cases from this circuit and elsewhere in support of its contentions as to the rule of evidence here in issue. These cases are inapposite not only because they are readily distinguishable but also because they simply do not stand for such an overbroad proposition. Rather, they support the correct rule, which is one of inquiry: whether the jury can receive appreciable help from the witness. If the question is one which the layman is competent to determine for himself, the opinion testimony is excluded; if he reasonably cannot form his own conclusion without the assistance of the expert, the testimony is admissible. See generally 7 Wigmore, Evidence §§ 1917-1929 (3rd Ed. 1940), and cases cited therein.
"[7] A medical malpractice case is one of the classic examples of the necessity of expert opinion testimony as to the ultimate issueindeed, it appears settled in *152 most jurisdictions that a plaintiff in such a case cannot succeed without it."
For the reasons stated in Steinberg, it is our view that the expert medical witnesses in the present case should have been allowed to express an opinion as to the ultimate issue of whether Dr. Dunning used the degree of care and skill ordinarily employed under similar circumstances by members of his profession in good standing in the community.
Nevertheless, the error is not cause for reversal in the present case because in other portions of the testimony of both Dr. Meuleman and Dr. Larriviere they did express their opinion before the jury. Dr. Meuleman testified as follows:
"Q You believe it is your opinion in view of the circumstances that Doctor Dunning was operating under that the damage to the radial nerve in his case was unavoidable?
"A It was inadvertently done, absolutely.
"Q By that do you mean it was unintentional and unavoidable?
"A Quite unintentional and could have happened to myself, or probably anybody.
"Q Even though you were using care and caution and skill and experience and training?
"A Yes, sir, I think you could.
"BY MR. PUGH"
"That's all.
"RE-DIRECT EXAMINATION BY MR. EDWARDS:
"Q You say it was inadvertently done?
"A Yes, sir.
"Q I noticed when Mr. Pugh pressed you, you didn't say it was unavoidably damaged because certainly in cases such as the ones you have just described where you know there is a danger involved, you are particularly careful for those nerves, are you not?
"A That's right."
Dr. Larriviere testified before the jury:
"Q Do you follow the same procedure and use the same technique that Doctor Dunning does?
"A Exactly.
"Q Is that the accepted standard procedure for non-union of the humerus in this type?
"A Yes, sir.
"Q If you had to do this operation tomorrow would you proceed in the same manner and do the same thing that Doctor Dunning did that day?
"A Correct."
Dr. Larriviere also testified in the presence of the jury that it was his opinion the severance of the nerve was "unavoidable". This is essentially the same as the testimony which he gave in his proffer of proof.
Of course, the jury had the right to weigh these opinions expressed by Dr. Meuleman and Dr. Larriviere along with all of the other opinions and statements expressed by these and other witnesses. As stated above, the expert medical testimony as a whole shows that Dr. Dunning used the customary and proper surgical procedure. But the fact is that he severed the radial nerve, a thing which none of the other expert medical witnesses had ever done, or heard of being done, in the course of this surgical procedure. The jury, in its discretion, had the right to accept this as sufficient to show that Dr. Dunning deviated below the standard of care required.
ERROR BY THE COURT IN REFUSING TO ALLOW DEFENDANTS TO SHOW FULLY THE NATURE AND EXTENT OF A 1967 WRIST INJURY
Plaintiff testified that in 1967, two years before the injury in question here, he fell and broke his wrist. Dr. Dunning, who treated him on that occasion, stated that as a result of the 1967 injury plaintiff had a wrist deformity with some arthritic *153 changes and resulting pain. The doctors generally agreed that pain of the wrist could not be caused by damage to the radial nerve. Defendants' counsel contends he was prepared to show that all, or at least part, of the disability of which plaintiff presently complains, was due to the old 1967 wrist injury. In particular, defendants say that Dr. Bordelon was not allowed to testify as to the extent of the disability of the arm due to the wrist injury.
Even assuming Dr. Bordelon should have been allowed to testify more fully, we do not find this to be reversible error. The record contains sufficient testimony of the physicians for an evaluation of the extent of the disabilty which is due to the 1967 wrist injury. This will be discussed in more detail by us in connection with the quantum of damages issue.
ERROR IN CHARGE ON RES IPSA LOQUITUR
The trial judge charged the jury as follows:
"Where, during the rendering of the professional services, there occurs some untoward event or some omission or act from which there resulted something not ordinarily found to occur during such treatment or operation, the physician or surgeon is then required to show that such unusual occurrence did not result from negligence on his part."
Defendants say this was a charge that the doctrine of res ipsa loquitur applies to this case. We do not agree.
In the recent case of McCann v. Baton Rouge General Hospital, et al., La., 276 So.2d 259 (1973), our Supreme Court applied the doctrine of res ipsa loquitur in a medical malpractice case but carefully limited the holding to the particular facts alleged. In the course of the opinion, it is pointed out that res ipsa loquitur is a rule of circumstantial evidence. Where there is no direct evidence to show the cause of the injury, and the circumstantial evidence suggests the negligence of the defendant as the most plausible explanation of the injury, the rule may be applied. But it is clear that res ipsa loquitur has no application where there is direct evidence to show the cause of the injury. As stated by our Supreme Court in McCann, "Res ipsa loquitur is, of course, irrelevant when a body of direct evidence is available explaining the activity leading to the injury." Here, the defendant himself gave direct testimony that the cause of the injury was his severance of the radial nerve during surgery. The issue in the present case is not the cause of the injury, but whether Dr. Dunning exercised the standard of care required. Thus, res ipsa loquitur has no application here.
With this understanding of res ipsa loquitur, the quoted charge does not state that doctrine. The charge does not require Dr. Dunning to show he did not cause the injury. It requires him to show, if untoward injury occurred during the surgery, that he was free from negligence, i. e., that he exercised the duty of care required. This charge is a correct statement of the law of this state in medical malpractice cases, Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953).

THE EXCESSIVENESS OF THE AWARD
The jury returned a verdict in the sum of $150,000. We find this was an abuse of the jury's discretion.
There was no substantial pain. The expert medical testimony shows clearly that recovery of the radial nerve from a severance is not painful.
As to loss of function, the evidence shows clearly that the radial nerve regenerated all of the muscles to which it is attached. This nerve controls the muscles that raise the hand and lift the fingers. The only residual from the injury is weakness in these muscles. Otherwise, the arm *154 is normal, except for the deformity of the wrist caused by the unrelated fracture in 1967.
Dr. Robertson, the neurological surgeon of Houston, Texas, who was called as a witness by the plaintiff, gave the following detailed description of plaintiff's residual disability:
"I have recorded as of February 9th, 1972, that there was no ascertainable weakness of the upper arm musculature including the biceps; there was no weakness of the supinators of the forearm; however, it is notices there is weakness, minimum degree, of the wrist extensors on the right, the abductors of the thumb and to the extensors of the thumb and extensors of the remainder of the digits. "However, rather than this being major weakness, it is noted there was good strength within a range of motion within which the patient has been placed or has been placing his fingers."
Dr. Meuleman stated that due to atrophy of the muscles which raise the hand and lift the fingers, there is a 15% disability of the arm as a whole. However, he stated that "with a strong effort on his part. . . with his normal uses he probably would reclaim a fair percentage of that." It is noted that Dr. Meuleman's last examination was about nine months after Dr. Robertson's. This would indicate that the wrist and fingers are gaining strength.
Another factor which must be considered is that plaintiff did not have a normal right arm before the surgery. The evidence shows clearly that because of a fracture of his wrist in 1967 he had residual deformity which contributed in some degree to the disability of the wrist. Also, the 1969 fracture and seven months in a cast caused some atrophy.
On the other hand, it is true that at the time of the 1969 fracture plaintiff was working as a roustabout on an oil rig. The doctors generally agree that because of the weakness in his hand and fingers he cannot now handle the tools and do the climbing required of a roughneck in the oil fields. However, all of the doctors agree that plaintiff can work in gainful employment which does not require full strength of the hand and fingers.
The evidence shows that at the time of the accident in 1969 plaintiff was about 47 years of age. His income tax returns show that he averaged about $8,000 annually during the years immediately preceding 1969.
Summarizing, there was little or no pain resulting from the severance of the nerve. There is 15% to 25% loss of use of the arm as a whole, due to atrophy and weakness in the muscles which lift the hand and the fingers, but this will probably improve. Plaintiff will undoubtedly suffer some loss of earnings, but he will be able to work. The award of $150,000 is excessive. We find it must be reduced to the sum of $50,000.
For the reasons assigned, the judgment appealed is amended so as to reduce the amount of the award to $50,000. Otherwise, the judgment is affirmed.
Affirmed, as amended.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I am unable to agree with the conclusions reached by my colleagues either as to liability or as to quantum.
The principle of law to be applied in malpractice suits against physicians was stated by our Supreme Court in the leading case of Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954), as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise *155 the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
The record in the instant suit includes the testimonies of four physicians, other than Dr. Dunning. All of those physicians, without a single exception, testified that Dr. Dunning exercised the degree of skill ordinarily employed under similar circumstances by members of his profession in good standing in the same community or locality. The evidence shows, without contradiction, that he was well trained and was skillful and experienced in performing this type of surgery, and that he used reasonable care and diligence, along with his best judgment, in the application of his skill to the case.
The three orthopaedic surgeons who testified stated that Dr. Dunning performed the surgery in exactly the same way anyone of them would have performed it, and that the radial nerve might have been severed in the same way if any of them had performed the operation. The fourth physician whose testimony appears in the record is a neurological surgeon, and he expressed no opinion as to the correctness of the surgical procedure used by Dr. Dunning.
The evidence thus shows, without any contradiction at all, that every element of the test to be applied in these cases has been met, and that there thus is no liability on the part of Dr. Dunning.
My colleagues, however, have based their decision solely and only on the fact that none of the four doctors who testified had ever severed a radial nerve during surgery, and that they had not heard of such an occurrence in the community. In my opinion that is not the proper test to be applied in a case of this kind. The use of such a test is in direct conflict with all of the established jurisprudence.
Prior to the surgery performed by Dr. Dunning, plaintiff's left arm was almost totally useless because the fractured humerus had failed to knit. Dr. Dunning, of course, was not responsible in any way for the fracture which plaintiff sustained or for the failure of the bone to knit. All doctors agree that the accepted and proper way to correct that condition was to perform exactly the same type of surgery which Dr. Dunning performed in exactly the same way. A heavy layer of scar tissue and hard callus, about one-half inch thick, had formed at the site of the fracture, and the radial nerve was completely embedded in that layer.
The evidence shows that the nerve, the scar tissue and the callus are all about the same color, and when the nerve becomes embedded in that tissue and callus, as occurred in this case, it is impossible to see or to locate the nerve. The scar tissue and callus had to be removed, however, before the ends of the fractured bones could be joined together, and since the callus was very hard the danger of damaging or severing the radial nerve was a necessary risk which had to be taken in performing that particular type of surgery. Every doctor recognized that fact, and all of them said that the procedure used by Dr. Dunning was the best one to use, and it was the same procedure they would have used. As a result of the surgery, plaintiff has recovered almost the full use of his wrist, despite the severed radial nerve. So even though the worst happened, that is, the nerve was severed, the operation nevertheless was greatly beneficial to plaintiff.
The majority states that some of the doctors were reluctant to say that the severance of the radial nerve was "unavoidable." It is true that Dr. Luke Bordelon, when asked whether the occurrence was unavoidable, compared it to an automobile accident. He explained, however, that an automobile accident could be avoided by staying at home, and his meaning was clear that the only way for the severance of the radial nerve to have been avoided in *156 this case was for Dr. Dunning to have refused to perform the surgery at all. My colleagues obviously overlooked the further testimony of Dr. Bordelon, which reads as follows:
"Q: Would you consider it an unavoidable risk then of the operation itself is the danger of severing the nerve?
A: Severing or injuring the nerve, correct." (Emphasis added).
My colleagues make special mention of the fact that Dr. Meuleman would not state that the severance of the nerve was unavoidable, despite being pressed to do so by counsel for defendant. My appreciation of his testimony is that when it was pointed out that he had used the word "inadvertent," instead of "unavoidable," he immediately explained that he meant both. Here is the pertinent part of his testimony:
"Q: You used inadvertently. That has come up here before. Do you mean by that unintentional, unavoidable, sir?
A: I mean exactly that." (Emphasis added)
I think it is significant that Dr. Meuleman was called by plaintiff, as his only expert, to show that Dr. Dunning was guilty of malpractice. Dr. Meuleman testified in great detail as to the skill and efficiency of Dr. Dunning in performing this particular operation. He stated that he, Dr. Meuleman, had performed 18 similar operations, and in three or four of them he had damaged the radial nerve, resulting in a temporary wrist drop, inability to move the fingers and the thumb, as in the instant suit. In none of those instances was the nerve severed, but he concedes that the danger of severing the nerve and of damaging it is simply a matter of degree.
Dr. Hugh Larriviere was asked the question: "Is that one of the unavoidable risks of an accident of this type, doctor?" And his answer was: "Correct." He stated that the procedure and technique used by Dr. Dunning was the accepted standard procedure, and it is exactly the same procedure that he would use if he had to perform the same operation today.
Actually, the test to be applied is not whether the occurrence was "unavoidable," but instead it is the above mentioned test which is set out in the Meyer case, supra. I can find nothing in the record which in any way indicates that Dr. Dunning failed to meet all of the requirements established by our jurisprudence in cases of this kind.
Even if there should be liability in this case, I believe that the award made by my colleagues, even though reduced from the amount allowed by the jury in the trial court, is highly excessive.
While it is true that the doctors stated that plaintiff's left wrist is disabled from 15 to 25 percent, my colleagues overlook the fact that this is only a temporary disability. All the medical evidence shows that the radial nerve has regenerated, and that it now controls all of the muscles of the hand and arm. The only reason why plaintiff has any disability in his wrist now is because of atrophy which resulted from the fact that his arm was immobilized in a splint for a period of time, and plaintiff has not taken the physical therapy which was prescribed. As I understand the medical testimony, plaintiff will soon recover almost the same use of his hand that he had before the fracture occurred, even though he has not exercised it properly. We should remember that he had little or no use of his wrist before the surgery was performed, so he has been greatly improved by the operation which Dr. Dunning performed.
My colleagues have also overlooked the fact that plaintiff fractured his left wrist in 1967, two years before the fracture involved here occurred, that he was incapacitated for six months because of that fracture, and that his wrist was deformed as a *157 result of that earlier accident. Dr. Meuleman, plaintiff's own expert witness, testified that plaintiff had a "markedly distorted wrist joint" before the accident involved here ever occurred, resulting from the 1967 accident, and he stated that in his opinion of plaintiff has any disability of that wrist now it is attributable to the 1967 injury, and not to the damage to the radial nerve which occurred in 1969.
Under these circumstances it appears to me that, even if there should be liability in the case, the award of $50,000.00 is exorbitant, and is far out of line with awards made in other similar cases.
For these reasons I respectfully dissent.