HAMITER, Justice.
During the morning of June 30, 19S0, in the operating room of Hotel Dieu which is a hospital located in the City of New Orleans, Mrs. Eugenie Meyer Barnett was receiving a general anesthetic, preparatory to the extraction of all of her remaining teeth, when an upper front tooth became dislodged and found its way into one of her lungs.
The tooth was removed from the lung, and thereafter she instituted this suit to recover damages allegedly sustained, she charging malpractice to Dr. Leopold L. Levy, the oral surgeon employed, and to Dr. Evelyn Katz, the performing anesthetist who is a physician. Also impleaded as defendants were certain alleged liability insurance carriers and the corporation operating the hospital.
After trial the district court held that the doctrine of res ipsa loquitor is inapplicable to the cause and that the plaintiff had failed to sustain the burden of proving negligence on the part of any of the defendants. Accordingly, the suit was dismissed.
The Orleans Court of Appeal, on an appeal to it, reached the conclusion that the mentioned doctrine is applicable and that, by reason thereof, the defendants carried the burden of showing absence of negligence. But it further concluded that the *623 defendants had discharged that duty. Consequently, it affirmed the district court’s judgment. See 61 So.2d 901.
This court, on plaintiff’s application, issued the writ of certiorari or review. In granting the writ a majority of the members entertained some doubt that the Court of Appeal’s decision was correct on the facts which it had found.
However, after considering the established facts in the light of the appropriate jurisprudence of this state, even assuming for the sake of argument that the doctrine of res ipsa loquitor is applicable here (we need not and do not determine whether it applies), we are now satisfied that the district court and the Court of Appeal correctly decreed a dismissal of the suit.
A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana 'Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S., Physicians and Surgeons, § 41.
From the record it appears that on or about June 15, 1950 plaintiff was advised by her regular dentist, Dr. Armand R-Suarez, to have extracted all of the teeth which she then possessed, he suggesting that they be removed under general anesthesia. This was deemed necessary because of an existing pyorrhetic condition which previously (since 1947) had prompted his pulling, from time to time, five of her teeth, although they were firmly imbedded. For performing the extractions Dr. Suarez recommended that plaintiff employ Dr. Levy, one of the defendants and a dentist specializing in exodontia oral surgery, with whom he secured an appointment for her.
As scheduled she consulted Dr. Levy on June 26, 1950 (and again on June 28), requesting that he extract her teeth at the hospital. He looked into her mouth, found a generalized condition of pyorrhea, and noticed that a tooth on the upper left side appeared to be loose. But he made no close examination of each tooth for the purpose of determining the question of its looseness. According to plaintiff there were no loose teeth except the one that Dr. Levy had observed. In this connection she testified:
“Q. Were you ever told by Dr. Levy or anyone else before this ex *625 traction of your teeth if any were loose except the one you told us about ? A. Dr. Levy never said anything about my teeth except he noticed this loose tooth. That was the only one he mentioned.
“Q. That was the tooth on the side ? A. That was the only one.
% % ^ ‡ H* sfc
“Q. To your knowledge were your .other teeth loose ? A. They were not.
“Q. In particular, was the front •tooth that you claim was knocked out in the operating room loose? A. It was not.”
Dr. Levy requested that her family •physician (a Dr. Rougelot) examine her and certify as to her good physical con•dition and also make reservations at Hotel Dieu for the operation. When that had been performed he furnished written instructions to the hospital which were delivered on her admission there.
Shortly after plaintiff was brought into the operating room of Hotel Dieu on the morning of June 30, 1950 Dr. Evelyn Katz, •a defendant herein and the anesthesiologist in charge of the Department of Anesthesia .at the named institution, had the patient •placed on the table (lying on the back) ■and made preparations for administering the anesthetic. Others in the room at the time were a registered nurse, a scrub nurse, .and Dr. Levy.
Knowing that the operation called for the extraction of all of the teeth, which she had noticed but had not carefully examined, Dr. Katz planned to resort to the often used method that leaves the mouth unobstructed and is known as nasal endotracheal intubation. As correctly stated in the Court of Appeal’s opinion, “ * * * This method requires that a rubber tube be passed through the nose and that the tip of it be seated behind the trachea. To insert this tube there must be employed a laryngoscope, the one used in this case being known as a Guedel laryngoscope, which is a metallic instrument the body of which is held in the hand of the anesthetist, and which body is about the size of the ordinary household flashlight. Attached to the upper end of this instrument is a flat piece of metal several inches in length, about as wide as the blade of a wide table knife, and which is about an inch or more in thickness from the top to the bottom, at the rear end, and tapers to about one-half inch at the forward end. On the forward end of this upper extension there is a flashlight, which enables the anesthetist to see just where the rubber tube is being placed as it enters the throat after having passed through the nose. When this laryngoscope is inserted into the mouth, it obviously occupies almost the entire opening between the lips.”
As a preliminary to resorting to the mentioned method the anesthetist gave ether to the patient through a mask placed *627 over the face. When a deep sleep ensued, she removed the mask and sought to pass through the nose and to set in the larynx, with the aid of the laryngoscope, the intratracheal tube. Ultimately, and with much difficulty, the passing and setting were accomplished. Then the tube was connected to the appropriate machine, the giving of the anesthetic was resumed, and the laryngoscope was removed from plaintiff’s throat and mouth.
About this time discovery was made of a bleeding socket, from which a tooth was missing, in the upper front part of the mouth. Dr. Levy, who had been in the room the entire time except for a few moments when scrubbing and washing his hands in preparation for the operation, says that he discovered it on opening the mouth, after the anesthetist had announced readiness of the patient for the extractions, and that he informed Dr. Katz of his finding. The latter thinks that they observed the bleeding, empty socket simultaneously, while Dr. Levy was standing nearby and she was attempting to effect stability as between the patient and the anesthesia machine. But the matter of who first noticed the condition appears unimportant, especially in view of the fact that it was discovered and acted upon as soon as possible, that is immediately on the removal of the view obstructing laryngoscope which had practically filled the opening between plaintiff’s lips.
A search was promptly started for the-missing upper front tooth. Having been, unable to locate it in the mouth or on the table, Dr. Levy ordered and obtained shortly an X-ray which disclosed the object in. the patient’s right lung. Thereupon she was taken to the bronchoscopic room of' the hospital where the tooth was removed with a bronchoscope by a Dr. Taquino, a. specialist in the use of that instrument. After the bronchoscope had been withdrawn Dr. Levy examined the patient and' discovered that the side tooth initially determined to be loose had been knocked out during the bronchoscopy and was lying" in the mouth. He withdrew it with his-fingers.
As a result of the mentioned accident" the planned operation by Dr. Levy was. not performed. However, in June, 1951,. approximately a year later, plaintiff engaged another dentist, Dr. Ralph Sherwood,, who extracted her upper teeth. To quote-plaintiff : “He gave me novocain when he-extracted the teeth. The teeth were so hard to come out he used both hands to pull my teeth out. He even turned to the girl that: assisted him, he said, ‘Did you ever see-such hard teeth to come out ?’ ” As to the-lower teeth she testified: “When he looked' at them, examined them, he told me he-would refuse to take out the lower and' said positively not to take out the lower teeth because they were good for another ten years.”
*629 On behalf of Dr. Levy and Dr. Katz it ■was established, we think, as the Court of Appeal appropriately pointed out in great detail, that they were eminently qualified by education and experience to practice in the respective branches of medicine in which they were engaged at the time of the instant mishap, and that in the administering of the anesthetic they did everything reasonably required of them under the circumstances. But even if it could be .said that each was negligent in not having •closely examined plaintiff’s teeth for looseness before the commencement of the in■tubation, as plaintiff’s counsel principally •contends, the failure in that respect had no •causal connection with the accident. According to plaintiff’s own testimony, quoted 'herein above, she possessed only one loose tooth and it was not that which found its ■way into the lung. The unfortunate occurrence evidently resulted only from the 'laryngoscope’s coming in contact with plaintiff’s upper front teeth, which was impossible to avoid, and was something that ■may take place (according to the uncontradicted evidence) in spite of the exercise of the most extreme care.
Our views are now in accord with the ■Court of Appeal’s conclusion “that both .Dr. Levy and Dr. Katz did all that reason•ably careful practitioners, skilled in their •respective professions, could have done, •and that consequently there is no liability in •either. The necessary consequence is that there is no liability in any of the defendants.”
For the reasons assigned the decree of the Court of Appeal is affirmed.
PONDER, J., dissents.
McCALEB, J., dissents with written reasons.