BOUTALL, Judge.
This is a medical malpractice case filed against a doctor charging him with professional negligence occurring during treatment in January and February, 1959. It is alleged that plaintiff had a spontaneous abortion, and that in the ensuing treatment, the doctor failed to remove retained placental material. As a result, another operation was caused several months later in which a hysterectomy was necessitated. The trial court awarded judgment in favor of plaintiff, and the defendant doctor appeals.
The general facts are these. Mrs. Melba Lee Carpenter Johns was a patient of Dr. William K. Gauthier for some time for treatment of various ailments. On January 26, 1959, Dr. Gauthier admitted Mrs. Johns to the Metairie Hospital for a complaint of vaginal bleeding which had been present for some weeks prior thereto. Upon admission to the hospital it was discovered that Mrs. Johns was pregnant approximately 2 to 3 months, the pregnancy considered to have been sometime in the latter part of October. On January 28, 1959, Mrs. Johns suffered a spontaneous abortion and expelled a fetus while in her hospital bed. The doctor immediately examined her and, noting that the placenta was not expelled, began procedures to assist in the expulsion of the placenta. Because of her condition, he determined that he could not physically proceed further without endangering Mrs. Johns, and he attempted other procedures. On February 4, 1959, Dr. Gauthier proceeded to perform a surgical operation called a dilatation and curettage, commonly called a “D and C”, for the removal of the placental material which was retained. The doctor contends that he removed 90 to 95% of the placental material, and it is this which is at issue in this law suit.
Mrs. Johns continued to suffer bleeding and pain, and finally on April 27, 1959, she consulted Dr. Albert J. Lauro, who determined that Mrs. Johns had an enlarged uterus as well as the bleeding complained of. He determined that the possible condition she had was beyond his specialty and *505 referred her to Dr. Louis Gallo, an obstetrician and gynecologist.
Dr. Gallo had Mrs. Johns admitted to Hotel Dieu Hospital, and on May 8, 1959, he attempted to perform another “D and C” to correct Mrs. Johns’ condition. However, almost immediately upon the entry of the curette, Mrs. Johns began to hemorrhage and went into shock. Because of the immediate danger to her life, Dr. Gallo performed an abdominal hysterectomy and removed the entire uterus. It was discovered that the uterus contained placental material attached to the wall of the uterus, and that this material was necrotic and calcified.
It is apparent that the presence of the placental material within the uterus caused the complaints that Mrs. Johns was experiencing, and which necessitated the removal of her uterus. Thus the basic issue in this case is whether Dr. Gauthier failed to remove this placental material on February 4, or whether the placental material was due to a subsequent pregnancy of Mrs. Johns. The trial judge rendered detailed and well considered reasons for judgment in this case, and appellant urges to us that he erred in certain of his findings, ánd of course, the subsequent judgment.
Appellant complains to us that the trial judge erred by misapplying the law applicable to the case. It is argued that the trial judge applied the doctrine of res ipsa loquitur and that this doctrine has no applicability in medical malpractice cases. Appellant relies upon the decisions in the case of Zachary v. St. Paul Fire & Marine Insurance Company, 249 So.2d 273 (La.App. 1st Cir., 1971); Foster v. St. Paul Fire & Marine Insurance Company, 212 So.2d 729 (La.App. 4th Cir., 1968); and others.
Without entering into a discussion as to whether the doctrine of res ipsa loquitur may be applicable in certain instances, we conclude that the doctrine was not applied in this case. In his reasons for judgment, the trial judge stated:
“It is now well recognized, under the jurisprudence of this state, that in order for a physician to be liable for malpractice, the plaintiff bears a burden of proving that he failed to exercise the care and skill ordinarily exerted by capable physicians and surgeons in the community, under the same circumstances, applying the latest scientific knowledge in his treatment of the patient.”
The trial judge further noted that:
“After carefully evaluating all of the evidence, both testimonial and documentary, the Court concludes that Dr. Gau-thier negligently failed to remove the retained placenta of the defective pregnancy sustained by Mrs. Johns, on January 31, 1959.”
It is evident that the trial judge did not consider this to be a case of res ipsa loqui-tur, nor do we consider it to be such. The record shows that there was a period slightly in excess of 3 months from the time of the last treatment by Dr. Gauthier to the operation performed by Dr. Gallo. There could have been other intervening causes, and thus the entire course of events was not under the sole control of Dr. Gau-thier.
The applicable law herein was stated by the Supreme Court of Louisiana in the case of Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954). In that case the court held as follows :
“[1] A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and dili *506 gence, along with his best judgment, in the application of his skill to the case.” (73 So.2d 782)
On rehearing the Court stated as follows in explanation of its rule :
“The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence.” (73 So.2d 786)
Although the decision in that case was by a divided court, the Supreme Court affirmed this jurisprudential holding unanimously in the case of Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966). Therefore we now proceed to a discussion of the evidence under those principles of law.
Dr. Gauthier, on February 4, 1959, performed a dilatation and curettage of plaintiff’s uterus to remove the retained placenta. He testified in detail as to the manner in which he performed this surgical procedure, and produced the surgical technician as well as the operating room supervising nurse to substantiate what he did. Additionally, his procedure was made known to expert witnesses, Dr. Curtis Tyrone of the Tulane Medical School,- and Dr. Shirley Lyons, both of whom testified as experts. It thus appears that his detailed description of his procedure was in accordance with the accepted standard employed by physicians in the locality, and should have produced the desired result of removing all of the placenta.
However, the record also shows that the physician cannot tell visually that he has removed all of the placenta, and that he must rely upon the accuracy of his technique. The physician is able to tell, by exploration with his fingers, and by the difference in sound of his curette as he employs it, that he has removed all of the placenta from the lining of the uterus. It is conceded that it is extremely difficult to remove every minute particle, and in this case, the doctor concluded that he had removed from 90 to 95% of the placenta. Such an amount remaining should cause no difficulties, and more particularly, certainly could not cause the problem that occurred later wherein a large mass of placenta was later determined to remain.
The issue is thus narrowed to this: that if the doctor performed this surgical procedure with the usual skill required, there could not be left in the uterus the amount of placental material later discovered.
The doctor contends that the only plausible explanation of the amount of placenta found by Dr. Gallo in the later operation was that Mrs. Johns became pregnant after the operation, and that the placenta found in May was due to this second pregnancy. Additionally, it was contended that such a mass of placental material could not remain within the uterus for the period of time that elapsed between the two operations, because Mrs. Johns would have either had to expel the material in some way or she would have encountered severe problems long before the elapsed time in question.
Considering first the question of a subsequent pregnancy, the record shows that both Mrs. Johns and her husband deny any sexual relations from the date of her discharge from the Metairie Hospital until after her release from Hotel Dieu after the second operation. This of course, *507 would be hardly sufficient by itself to constitute proof, but other circumstances show that a pregnancy did not occur. All of the doctors concede that a retained placenta of the size finally removed would cause frequent, regular, and periodic bleeding, and that a pregnancy could not occur until sometime after Mrs. Johns was discharged from the hospital in February. Opinions vary as to the length of time involved, but the trial judge felt that it was noteworthy that Dr. Tyrone, defendant’s expert, testified that it would be about a month from that time before a pregnancy could occur. Using this as a basis, the trial judge found that it was unlikely that a two month period could produce an enlarged uterus commensurate with a twelve week or longer pregnancy, and produce the mass of placental material found. At this point, it should be noted that the estimates of size of uterus and placental material range from 12 to 16 weeks gestation period. Similarly, there was no evidence of a fetus present in the uterus at the time of the second operation, nor was there any evidence of recent abortion. Instead of a normal placenta or even one which showed only signs of necrosis, the placental material examined was degenerated throughout the entire mass of the placenta and in a calcified state, which would indicate that it was dead tissue for several weeks or a month or more. When all of these factors are considered together, it becomes apparent that the mass found, being that commensurate with a twelve week pregnancy could not have occurred by virtue of any pregnancy which may have taken place in the interim between the two operations. To further support this proposition, a pregnancy test was performed upon Mrs. Johns prior to the May 8th operation and it showed negative for pregnancy. Thus there is ample evidence for the trial judge to have concluded as he did, that there was no second pregnancy.
As to the second proposition, that is, that the placental material could not have been retained for the 3 months period involved, the primary observation is, of course, that necrotic, calcified placental material was found attached to the uterus. During the course of the trial, which was piecemeal over a long period of time, evidence was developed by both parties which showed a serious conflict in the testimony of the doctors as to the medical possibility of retaining a placenta for the period involved. However, evidence was produced upon rebuttal, which clearly showed that placental material could be retained, and has been known to be retained over such a period, although with some difficulty. The testimony of Mrs. Johns, as well as the history she gave to the doctors, show such difficulties as may have been expected. In explanation of this apparent conflict in testimony, it was later conceded by defendant’s expert witness, that placental material could be retained for the period of time involved, but his opinion, that it was not so retained, was based upon the fact that he believed that Dr. Gauthier had removed the placental material. Of course, the basic question is whether Dr. Gauthier did successfully remove the material, and it appears to us that the preponderance of the evidence is that the placenta was not removed, but was in fact, retained.
The trial court found that, upon the evidence in the record, and as explained briefly above, it must be concluded that Dr. Gauthier negligently failed to remove the retained placenta later discovered. This retained placenta was the cause of the hysterectomy performed on May 8th. We are of the opinion that the evidence preponderates in favor of this conclusion, and accordingly we affirm the judgment.
Affirmed