299 So.2d 863 (1974)
Eva M. POPE, Plaintiff-Appellee,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY et al., Defendants-Appellants.
No. 12218.
Court of Appeal of Louisiana, Second Circuit.
February 12, 1974.
On Rehearing July 1, 1974.
Writ Refused September 20, 1974.
*864 Mayer & Smith by Charles L. Mayer, Shreveport, for defendants-appellants.
Dixon & Thomas by Edmund M. Thomas, Shreveport, Dodd, Hirsch, Barker, Avant & Wall by James D. Thomas, II, Baton Rouge, for plaintiff-appellee.
Before AYRES, BOLIN and WILLIAMS, JJ.
WILLIAMS, Judge.
Mrs. Eva M. Pope filed this medical malpractice suit against Dr. E. B. Robinson, Jr., his medical partnership, Robinson and Rayburn, and their public liability insurer, St. Paul Fire & Marine Insurance Company. Following a jury trial a $75,000 verdict was rendered in Mrs. Pope's favor against Dr. Robinson, Robinson and Rayburn, and their insurer. A judgment was signed accordingly. From this judgment a suspensive appeal was perfected by defendants seeking a reversal of the judgment. Plaintiff answered the appeal asking this court to increase the award.
Mrs. Pope had been a patient of Dr. Robinson for some years prior to May 27, 1969 when she consulted him about a lymph node on the back left side of her neck. Dr. Robinson recommended a biopsy of the lymph node. Mrs. Pope was admitted to Bossier General Hospital on May 28, 1969, where Dr. Robinson, removed the lymph node. Pathological study proved the node was nonmalignant.
Immediately following this operation, Mrs. Pope began to complain of pain and weakness in her left shoulder and arm. After several visits to Doctors Robinson and Rayburn, Mrs. Pope was referred to Dr. Don K. Joffrion, an orthopedic surgeon. On July 18, 1969 Dr. Joffrion diagnosed some mild loss of function of the left cervical part of the trapezius muscle. He advised Dr. Robinson possible nerve damage should be considered.
On July 29, 1969 Mrs. Pope consulted Dr. Derald G. Kellett, who stated he found no neurological deficits and felt she was functioning normally. On October 29, 1969 Mrs. Pope consulted Dr. James H. Shipp, neurologist, and on his recommendation Dr. Robinson had Mrs. Pope admitted into the hospital. He performed an extensive exploratory operation assisted by Dr. Heinz K. Faludi, a neurological surgeon. Dr. Robinson said he found no evidence to make him suspicious of any spinal accessory nerve injury.
Mrs. Pope continued to have trouble with her left shoulder and arm, and on August 18, 1970, consulted Dr. Austin W. Gleason, an orthopedic surgeon. Dr. Gleason diagnosed atrophy of the left shoulder muscles and referred her to Dr. E. M. Olmstead of Dallas, Texas, for an electromyogram. Dr. Olmstead determined the spinal accessory nerve serving the trapezius muscle was not functioning properly and was of the opinion the nerve had been damaged either in the original operation or the follow-up surgery. He asserted the nerve was probably entrapped with scarring encroaching on the nerve. This would eventually cause the total and complete degeneration of the nerve.
After receiving Dr. Olmstead's report, Dr. Gleason referred Mrs. Pope to Dr. Lloyd C. Megison on December 8, 1970. Both doctors diagnosed atrophy of the trapezius muscle and found Mrs. Pope was lacking ability to raise her left arm vertically or shrug her left shoulder. At this time these doctors were of the opinion the nerve was injured, but not severed.
*865 Mrs. Pope was sent to see Dr. A. William Dunn, an orthopedic surgeon at Ochsner Foundation Hospital in New Orleans. He examined her on March 26, 1971 and testified he found complete atrophy of the left trapezius muscle causing a rotation of the left scapula or shoulder blade. On April 21, 1971, Dr. Dunn operated on Mrs. Pope's shoulder to determine if the spinal accessory nerve could be located. If so, its ends could be reanastomosed or sewed together to re-establish nerve function and thereby re-establish muscle function. He expressed his inability to find the spinal accessory nerve, either end thereof, and was of the opinion the nerve had either been excised in that segment (about an inch in length between the two muscles) or had been incised (severed) and then had degenerated.
Dr. Dunn explained the reasons for caution by a surgeon performing a biopsy in the area of the spinal accessory nerve and what symptoms should alert the physician to nerve injury. He described Mrs. Pope's symptoms as a classic example thereof, and on November 25, 1972, Dr. Dunn performed a fourth operation on Mrs. Pope's left shoulder. This operation was to stabilize her left shoulder by transplanting a muscle from her left thigh to the left shoulder area. The photographs taken of Mrs. Pope show an incision approximately twelve inches long on her left thigh and an angular incision of comparable length on her left shoulder.
Dr. Robinson frankly stated during the May 28, 1969 operation he made no attempt to identify the spinal accessory nerve although he admitted when one is operating in that area there is a possibility the nerve could be in jeopardy. Dr. Robinson further expressed he knew of no other physician in this area who identifies the spinal accessory nerve in performing a simple lymph node biopsy on the neck. He further stated during the succeeding months of seeing and treating Mrs. Pope he had no reason to believe such nerve injury had occurred.
Mrs. Pope contends, in the operation performed by Dr. Robinson on May 28, 1969, he either severed the spinal accessory nerve or severely damaged it resulting in its complete deterioration.
In Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953) our Supreme Court defined the responsibility of a physician treating a patient. The jurisprudential rule stated was:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case.. . ." [73 So.2d 781, 782]
Dr. Robinson described Mrs. Pope's original operation as a simple nodal biopsy and the second as an extensive and exploratory operation to determine the nature of a mass in her neck. Although Dr. Robinson denied injuring Mrs. Pope's spinal accessory nerve, such an injury did occur.
Fourteen physicians testified during the trial. All of these men were eminently qualified in their respective fields. We have stated in general the treatment, opinion and method of diagnosis of the doctors who treated Mrs. Pope. We will briefly summarize the pertinent expert medical testimony in the record.
Dr. Richard P. Bland, an ear, nose and throat specialist of Shreveport, was called as a witness by Mrs. Pope. He had treated her for irritation of the throat. In his practice he performed lymph node biopsies. In his opinion, except for a superficial node in the skin, in performing a lymph node biopsy in the area of the spinal accessory nerve, it was good medical practice in *866 the community to locate and identify this nerve to prevent damage to it.
Dr. Austin W. Gleason, an orthopedic surgeon, Dr. Lloyd C. Megison, a neurosurgeon, and Dr. Don K. Joffrion, an orthopedic surgeon, all of Shreveport, testified substantially the same as Dr. Bland.
Dr. A. William Dunn agreed with Dr. Bland. He reasoned the same standards would be applicable in Shreveport as in New Orleans.
Dr. James H. Eddy, a surgeon of Shreveport, was called on behalf of defendants, and stated in his opinion in performing a simple nodal biopsy it would be gross error and not customary practice to search out and identify the spinal accessory nerve. In such a biopsy it would seem totally incorrect to dissect out a nerve, such as the spinal accessory, because on any given node the surgeon's distance from it varies. He testified:
"It is more sensible to expose the node carefully, keep the field dry, watch what you are doing, and take the node out."
Dr. Derald G. Kellett, a general and thoracic surgeon of Shreveport, substantially agreed with Dr. Eddy.
The conclusions of the medical experts make it abundantly clear, in a lymph node biopsy as Mrs. Pope had, the physician must use special care and caution to avoid damage to the spinal accessory nerve. None of the surgeons who testified had unintentionally severed or damaged such a nerve in this procedure.
The jury exercised its discretion by returning a verdict in favor of Mrs. Pope. The jury was convinced by a preponderance of evidence and found as a fact Dr. Robinson did not in his treatment of Mrs. Pope exercise the degree of skill ordinarily employed under similar circumstances by members of his professional specialty in good standing in the community. We find the evidence sufficient to support this verdict.
Defendants have also taken exception to the charge to the jury by the trial judge which reads:
"In order for a physician to be liable for malpractice, the plaintiff bears a burden of proving that he failed to exercise the care and skill ordinarily exerted by capable physicians and surgeons in the community under the same circumstances applying the latest scientific knowledge in his treatment of the patient."
There is no merit in defendants' contention. Such an identical charge was approved in Johns v. Gauthier, 266 So.2d 504, (La.App. 4th Cir. 1972, writ refused).
Defendants further contend the award by the jury was an abuse of its much discretion. Mrs. Pope, 41 years of age, was self-employed as a hair stylist operating her own beauty shop. She is a widow, dependent on her work for support, and had gross annual earnings in 1968 of $5,317.37. Since 1969 she has undergone four operations. There is evidence the spinal accessory nerve is a motor nerve which alone does not result in pain. However, Mrs. Pope lost the ability to perform the functions of her profession because she could not raise her left arm above 45 degrees from her body. Color photographs graphically reveal the cosmetic effect of the long scars left by the operation on her left shoulder and left thigh. Her ability to take part in sporting activities was materially reduced and Dr. Dunn enumerated some of the conditions she must accept as a result of her injury. These are weakness in elevation of her left arm, pain in holding the arm away from her side, aching in her left shoulder from normal activity, permanent repetitive pain and her household and other activities materially reduced. He opined she had a 20% permanent physical impairment and loss of physical function of her left upper extremity.
Mrs. Pope seeks an increase in the jury award. We find no evidence the jury abused its discretion in reaching its verdict and award. In Walker et al. v. Champion et *867 al., 288 So.2d 44 (1973) the Supreme Court of Louisiana stated:
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, . . . ." [LSA-C.C. Art. 1934(3)]
The judgment of the trial court is affirmed.
Defendants-appellants are assessed with all costs of this appeal.
Affirmed.

ON REHEARING
Before AYRES, BOLIN, PRICE, HALL and WILLIAMS, JJ.
BOLIN, Judge.
A rehearing was granted in this case in order that it might be considered by the Court en banc. After a painstaking review of the record and the excellent and forceful briefs of counsel for all litigants, we conclude our original decree was correct. In our original opinion we correctly stated the legal duty a physician owes to his patient as set forth in Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953):
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. . . ."
Appellants contend the trial judge erred in giving the following charge to the jury:
"In order for a physician to be liable for malpractice, the plaintiff bears a burden of proving that he failed to exercise the care and skill ordinarily exerted by capable physicians and surgeons in the community under the same circumstances applying the latest scientific knowledge in his treatment of the patient."

The thrust of this contention is leveled at the italicized portion of the foregoing charge. While persuasive arguments could be advanced both as to the correctness of this charge as well as to the incorrectness thereof, we do not find it necessary to resolve this question. Assuming the italicized portion of the charge was improper, we hold it was not harmful error. There is no contention Dr. Robinson's fault was in any way related to his failure to apply "the latest scientific knowledge in his treatment of the patient". We find the trial judge's charge to the jury when taken as a whole was not prejudicial to defendants.
Much has also been said by counsel for defendants about the many alleged errors and incorrect statements contained in our original opinion. We must concede this was an extremely tedious, complicated malpractice trial. By its very nature it must have taxed the minds of the jurors who initially listened to the witnesses and decided the case. Likewise we, as judges of this court, who sit as reviewers of the law and the facts, being trained in the law and not in medicine, have had a most difficult task in sifting through the record to determine whether the evidence is sufficient to support the jury verdict. However, this is our constitutional duty and we must and have performed it.
Without attempting to restate, clarify or correct any of the facts as outlined in our original opinion, we hold the jury had sufficient evidence to find Dr. Robinson, in the performance of a lymph node biopsy and the follow-up operative procedures in connection therewith, either severed a spinal accessory nerve or injured the nerve causing it to degenerate. This action by the physician constituted fault under Louisiana *868 Civil Code Article 2315 as interpreted by our case law, especially Meyer v. St. Paul Indemnity Company, supra.
The judgment of the lower court is affirmed at appellants' cost.
HALL, J., concurs in the decree.
PRICE, J., dissents and reserves the right to assign written reasons.
PRICE, Judge (dissenting):
I must respectfully dissent from the majority opinion in this case.
Dr. Robinson testified, and was corroborated by Dr. Rayburn, that the procedure on May 28, 1969, was to remove a free moving, small encapsulated lymph node for a pathological biopsy. The vast preponderance of the medical testimony by Drs. Bland, Kellett, Eddy, Rayburn and Robinson show Dr. Robinson performed this surgery by the method usually followed by surgeons in the local community. The medical evidence was made somewhat confusing by the continued reference by plaintiff to a medical treatise in questioning of several of the physicians which describes a more radical operative procedure for removing tubercular cervical lymph nodes involving a neck dissection. This evidence was irrelevant to this case.
Dr. Bland, on whose testimony the majority relies to set a standard for this procedure in the local community, acknowledged the distinction between the two procedures and in effect agreed the method followed by Dr. Robinson was one generally used by surgeons in this area.
Dr. James Eddy, a general surgeon who had performed hundreds of the identical surgical procedure involved herein, testified why the spinal accessory nerve is not first identified as contended by plaintiff as follows:
"Q. Now doctor, in connection with the performance of a lymph node biopsy, is it customary or is it practice to search out and identify the spinal accessory nerve?
"A. In a simple nodal biopsy, it is not only not common, I think it would be grossly in error to so do, it would entail a very expensive incision and very extensive amount of searching around or it might even be more apt to leave the damage than to simply cut down over the node, carefully remove the node. We don't cut things blindly. That is, we don't get a little pool of blood down in the hole and go grasping at things because this could lead to trouble.
We carefully identify the structures as we go along and we are conscious of the fact that there are structures in the neck that we don't want to damage and we watch for them as we go along but in a simple node biopsy, it would seem to be totally incorrect to dissect out a nerve like the spinal accessory because you might be quite some distance from it on any given node or you might be close to it. It is more sensible to expose the node carefully, keep the field dry, watch what you are doing, and take the node out."
The second phase of plaintiff's allegation of negligence relates to an alleged failure of Dr. Robinson to properly diagnose the cause of plaintiff's continued complaints of pain in her shoulder area beginning after the first surgery. It should be obvious that if the six or more specialists who evaluated plaintiff after the surgery with full knowledge of her medical history did not find sufficient symptoms to cause them to make such a diagnosis, how can it logically or reasonably be said Dr. Robinson was at fault in not having done so?
The evidence shows without question Dr. Robinson possesses the required qualifications to have performed the operative procedure *869 and treatment of plaintiff. He is properly licensed to practice medicine in the State of Louisiana, is a Diplomate of the American Board of Surgery, a member of the American College of Surgery, and is an associate professor of surgery at L.S.U. Medical School in Shreveport.
The evidence offered by plaintiff in this case has not fulfilled the burden required of her under the principles set forth in Meyer v. St. Paul Indemnity Co., 225 La. 618, 732 So.2d 781 (1953) and the judgment appealed should be reversed.