323 So.2d 186 (1975)
Daniel Lee DAIGLE, Plaintiff-Appellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY and Dr. John Doe, Defendants-Appellees.
No. 5188.
Court of Appeal of Louisiana, Third Circuit.
December 9, 1975.
Hagood & Putnam by Richard J. Putnam, Jr., Abbeville, for plaintiff-appellant.
Pugh, Boudreaux & Gachassin by Charles J. Boudreaux, Bean & Rush by James W. Bean, Lafayette, for defendants-appellees.
Before CULPEPPER, DOMENGEAUX and PAVY, JJ.
PAVY, Judge.
Daniel Lee Daigle filed this malpractice suit while terminally ill with cancer. After his death, his widow and child were substituted to continue the survived claim, and they filed a separate suit (No. 5189 on this court's docket) for their own wrongful death claim. This appeal is from a judgment based on a jury verdict in favor of defendants in the form of an interrogatory answer to the effect that the doctor was not negligent.
*187 On January 11, 1972, Mr. Daigle consulted Dr. Andre Perron for an abnormal condition in his scrotum. He testified that he had noticed a painless lump in his left testicle about two or three weeks before he visited Dr. Perron, that the lump was on the top side of the testicle, that the lump was not visible, and that when he first went to Dr. Perron it was about the size of his little finger, ¼ inch down, attached to the testicle itself and harder than the testicle. The doctor diagnosed it as epididymitis, prescribed antibiotics and antiinflammatory drugs and instructed the patient to return in two weeks. On February 5 the patient returned, the doctor examined him again, and prescribed Darvon for migraine headaches which Danny had at times. There is a dispute as to whether the doctor instructed Danny to return after the second visit. About March 22nd or 23rd, Danny experienced pain in his left testicle and on the 25th of that month consulted Dr. James Boudreaux, a practicing urologist in Lafayette. At this time the growth was about the size of his thumb, ¾ th of an inch from the top and in the same place on or in the testicle. The doctor diagnosed the condition as a testicular tumor and recommended exploratory surgery. On March 29, Danny consulted Dr. Thomas Kimbrough who also advised exploratory surgery, operated on Danny in Lafayette on April 3 and removed the left testicle and adjacent structures. Pathological examination at the Lafayette Hospital showed the tumor was malignant, and Danny was referred to the New Orleans Charity Hospital for further treatment. About two weeks later, he was operated on at that hospital, and the lymphatic system serving the testicles was removed. Two of the lymph nodes, distant in the system from the testicles, had metastatic lesions showing that the cancer had spread to those points. In October, metastatic lesions showed up on a lung in x-ray and in the liver by a scanning process. In February, 1973, Danny died of the cancerous condition.
Plaintiff contends: (1) that the condition in the scrotum which Dr. Perron examined on the first visit was a testicular tumor and not epididymitis, and (2) that in failing to detect or diagnose the condition as a tumor, the doctor was negligent and (3) that the malignancy spread from the testicle into the blood stream or from the lymph nodes into the blood stream during the delay attributable to the mis-diagnosis, thus causing uncontrolled metastasis and eventual death.
There appears to be no question regarding the applicable law or standard of care required of a general practitioner in the City of Lafayette or the application of the standard of care to the established facts of the case. The resolution of negligence must ultimately be determined by a decision as to whether the condition presented to Dr. Perron was a testicular tumor or epididymitis.
The testicle is oblong in shape. When the human male stands erect the two poles or elongated ends are vertically positioned, i. e., one at the top and one at the bottom. The epididymis is a small tube or duct about ¼ inch in diameter which starts at the top of the testicle and travels to the rear and downward and courses away from the testicle near the bottom. It actually adheres to or is fused with the testicle but is not encased in the testicular capsule and has a prominence of its own.
At the time of trial Dr. Perron had been in active private practice since 1969. He had the usual medical school education with internship and served three years at Pensacola, Florida in the Navy at which time he had general medical care of Naval personnel of which most were young males. According to testimony, he was qualified and competent to diagnose and treat epididymitis. He admitted that a painless lump in the testicle was a classical description of a testicular tumor. He stated he could differentiate between an epididymitis and a testicular tumor; that a general practitioner in Lafayette ought to be *188 able to so differentiate; that if the condition presented to him was a testicular tumor and not an epididymitis he had fallen below the standard of skill possessed by physicians in Lafayette; that if he had had any doubt as to whether the condition was in the testicle or in the epididymis he would have written it down on his notes; that in some cases there can be difficulty in distinguishing the conditions when the area is extremely swollen.
There are certain facts regarding the medical evidence which are undisputed and should be observed at this point: That testicular tumors are extremely rare; that the classical medical description of a testicular tumor is a painless lump in the testicle; that they generally occur between the ages of 20 to 40; that a layman will often describe a condition as being in his testicle when it is in fact outside the testicular capsule but within the scrotal sac; that epididymitis is one of the most common ailments of the male reproductive system and usually is accompanied by pain and swelling but not infrequently these qualities are lacking; that it sometimes localizes in a portion of the epididymis in the form of a nodule; that a malignant tumor (commonly called cancer) is one that has the capacity to spread or metastasize from its original or primary site to other parts of the body and invade, impair and destroy the functioning of vital organs; that the rate of growth of a tumor varies not only as between types of tumors but from individual or individual.
The law is well settled that a physician, surgeon or dentist is not required to exercise the highest degree of skill and care possible and that as a general rule it is his duty to exercise that ordinarily employed under similar circumstances by members of his profession in good standing in the same area and to use reasonable care and diligence along with his best judgment in the application of his skill to the case. See Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953).
Plaintiff argues that certain statistical information is of compelling probative force in determining whether Dr. Perron met that standard of care. Dr. Markland testified that testicular tumors affect one out of every 50,000 males between the ages of 20 and 40. The plaintiff further points out that, under defendants' theory of the case, the tumor had to come into existence at a certain time and that it had to occur in the same testicle affected by the epididymitis. We do not think the 50,000 to 1 odds are relevant. The fact is that the cancer did occur. Epididymitis is probably the most common ailment of the male reproductive system. We think there is force to plaintiff's argument, not because of the odds against the cancer occurring at all or that it occurred in the same testicle, but that it occurred at the particular time. The coincidence is extreme, but it does not constitute a compelling or conclusive factor. General statistical information should be considered along with all the other evidence and can rarely be conclusive.
Under defendants' theory of the case, the tumor was not palpable at the last visit to Dr. Perron on February 12. Thus it would have to have grown from a nonpalpable size at that time to the size of a thumb ¾ inch down when it began bothering Danny on March 22nd or 23rd. There are expressions from the experts that such a rate of growth would have been fairly rapid but others state that it would not have been unusual. These testicular tumors are notoriously fast-growing. Instances of nontesticular tumors reaching sizes much bigger than this and in a shorter time were cited by the experts. Of great importance here is that the size of the tumor at removal and just prior thereto was not completely due to growth. Both Drs. Brierre and Markland, agreed that the pain episode of March 22nd or 23rd was probably due to a hemorrhage within the tumor. Dr. Brierre explained that when hemorrhage occurs the blood flows out into the tissues and presses against blood vessels. The veins, having *189 less counterpressure, are shut off before the arteries. The blood continues to flow to the hemorrhaging area through the arterial circulation but is not taken out of it by the venous circulation. The result is that the tumor increases in size not from growth but from engorgement with blood. This same effect can occur during surgery because of ligations. There is little, if any, probative force for plaintiff in the growth factor.
Another issue was that stemming from the absence of miscroscopically observable traces of infection in the epididymis. The general trend of the expert testimony is that the severity and type or cause of the infection in the epididymis would determine whether traces would remain on the date of the operation. The cause of the alleged epididymitis is not shown. It would appear that the alleged epididymitis was slight or moderate. There was little or no swelling; and pain, if any, only arose from pressure. Dr. Markland was very emphatic that epididymitis in January or February would have left traces in early April. He had no actual statistics and based this mostly on removal of epididymides in acute stages of infection or involving chronic histories. We do not think this claim, based on absence of traces of the infection, has anything other than moderate probative value for plaintiff.
Absence of pain is consistent with a tumor but does not necessarily negate epididymitis. The expert opinion is that there could be a mild or low-grade infection of the epididymis without pain but this would not be the usual case.
Dr. Perron's records indicated the epididymis was firm. There is no notation that it was enlarged to a palpable degree. This problem is similar to that of pain to the extent that the expert's opinions indicate enlargement is usually the case but not necessarily so. This would be a factor in plaintiff's favor.
Plaintiff argues that the doctor's notation in his records that the deceased "still" had a nodule on second visit but that the presence of a nodule was not noted on his first visit indicates that the doctor failed to detect the nodule (tumor) on the first visit. There was a lengthy and inconclusive interrogation of the doctor on the meaning of the word "still" in the stated context. Suffice it to say that there was substantial expert testimony that an epididymitis can resolve itself into a nodule. We do not think any specific and unalterable meaning can be assigned to the questioned expression. Little or no strength or force for plaintiff is to be had on this issue.
Plaintiff relies to a considerable extent on the lay description of the abnormality. The deceased stated the lump was in the testicle. On trial, his wife stated that the lump or mass was in the testicle but sticking out or bulging. In a deposition, she had been made to differentiate between the testicle and the scrotum and stated that the lump was separate from the testicle. At trial, she disavowed her deposition answer and blamed it on nervousness and confusion over the question. This testimony is set out previously. Preponderating credence to her original statement would be an extremely strong factor in defendants' favor.
It is noted that a decrease in size of the abnormality between the visits to Dr. Perron would be inconsistent with tumor and consistent with infection. Tumors do not shrink but the cure of an infection decreases any swelling. Danny himself testified to a decrease in the size of the lump or mass. This was confirmed by his wife and Dr. Boudreaux. The extent to which it had decreased is indicated by the fact that, in discussing the problem, Danny asked Dr. Boudreaux if he couldn't take the same medicine prescribed by Dr. Perron to "diminish it". We consider this size decrease to be a fact in defendants' favor.
It is well settled that the plaintiff in a malpractice suit bears the burden of proof. Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953); *190 Pope v. St. Paul Fire & Marine Insurance Co., 299 So.2d 863 (La.App. 2d Cir. 1974); Johns v. Gauthier, 266 So.2d 504 (La.App. 4th Cir. 1972).
Reference is made to a statement in the Meyer case, supra, as follows:
"The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying skill to the given case he used reasonable care and diligence along with his best judgment."
We cannot construe that language to mean that defendant herein must show that the condition was epididymitis and not a testicular tumor. We think the evidence showing that the doctor did make the required examination by palpation discharges the burden imposed by the quoted language. Whether that examination was physically insufficient or he misconstrued his findings depends on what the condition was at that time. That is an issue under plaintiff's basic burden of proof.
The case is a difficult one. There are various factors on both sides. In some instances, evaluation of credibility is involved. Further decisions were necessary to give to credible testimony its proper effect in the overall evaluation of the case. The weighing of the opinions of the experts was extremely important. There were a substantial number of evidentiary issues peculiarly within the province of the fact-trier. The rule mandating affirmance of a verdict not manifestly erroneous is peculiarly appropriate here. See Cantor v. Koehring Company, 283 So.2d 716 (La. 1973) and authorities cited therein; Wiley v. Travelers Insurance Company, 300 So.2d 555 (La.App. 3rd Cir. 1974).
By answer to appeal, defendant seeks annulment of a forma pauperis order. The motion to traverse was filed during a 2 to 3 week gap in the trial, heard on the last day of the trial by the judge in chambers and decided on the strength of plaintiffs' affidavit with defendant being allowed to make an offer of proof. The affidavit shows the widow and child jointly have social security income of $442 per month, that she has a net worth of $1,383.24, that said net worth exceeds her savings by only $253.34, that the child has savings of $2,250, accumulated from social security benefits, that since losing her job, the widow's assets are being depleted, that the social security benefits received by her and the child jointly are not sufficient to support them in their accustomed manner. Upon consideration of these facts, the nature of the claim and the fact that a jury trial was almost completed when the challenge was made to the pauper status, we think that the trial judge was eminently correct in declining to rescind the previous order allowing plaintiff to proceed without payment of costs. We do not feel that the matters contained in the offer of proof would change the outcome.
For the reasons assigned, the decision of the district court is affirmed. All costs of these proceedings are to be paid by plaintiffs-appellants.
Affirmed.