**Royal M. LADNIER**

v.

**Gary L. NORWOOD, D.V.M.; et al.**

**No. 83–54.**

United States District Court;
E.D. Louisiana.

March 5, 1985.

George M. Papale, Gretna, La., for plaintiff.

Richard S. Vale, Metairie, La., for Gary L. Norwood, D.V.M.

Henry B. Alsobrook, Jr., Adams and Reese, New Orleans, La., for Schering Corp.

WICKER, District Judge.

Plaintiff, Royal M. Ladnier, brought this action against defendants Gary L. Norwood, D.V.M., his insurer, Associated Indemnity Corporation, and Back-Stretch Surgery and Medicine, Inc. (hereinafter Back-Stretch) to recover damages for the death of his thoroughbred racehorse due to the alleged negligence of Dr. Norwood in administering to the horse a drug named Myosel-E.[1]

This case was tried before the Court, sitting without a jury, on a former date. Having considered the pleadings, the evidence adduced at trial, the arguments and briefs of counsel and the applicable law, this Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. At all times pertinent hereto, plaintiff, Royal M. Ladnier, was a Mississippi domiciliary and was the owner of a racehorse known as Flush Pilot.

2. At all pertinent times, defendant, Gary L. Norwood, D.V.M., was a resident of the State of Louisiana, and a practitioner of Veterinary Medicine, licensed by the State of Louisiana, and practicing same within the Eastern District of Louisiana.

3. The defendant, Back-Stretch, a Louisiana corporation, was at all times pertinent hereto the employer of the defendant, Gary L. Norwood, D.V.M.

4. At all times pertinent hereto, the defendant, Associated Indemnity Corporation, a foreign insurance company, authorized to do and doing business within the State of Louisiana, had in full force and effect a policy of liability insurance issued to defendant, Gary L. Norwood, D.V.M.[2]

5. Flush Pilot, a thoroughbred Bay Colt, was foaled on May 30, 1979 by Flush out of Delta Doll.[3] Plaintiff purchased him when he was approximately four and one half months old for Four Thousand and No/100 Dollars ($4,000.00).[4]

6. After approximately a year of maturation, the horse was brought to New Orleans to compete at local racetracks. As of August 5, 1982, Flush Pilot had run in seven races, making two first place finishes, one second place finish, one third place finish and won $12,030.00 in prize money.[5]

---

**1.** Plaintiff initially sued the Schering Corporation, the manufacturer of Myosel-E, but it was voluntarily dismissed prior to trial.

**2.** Defendant's Exhibit H.

**3.** Plaintiff's Exhibit 5.

**4.** Plaintiff's Exhibit 10.

**5.** Plaintiff's Exhibits 12 and 9.

7. Flush Pilot suffered from anhidrosis.[6] Dr. Jill McClure, plaintiff's expert, testified that the cause of anhidrosis is unknown.[7] Also, there is no known cure but only various methods of treatment. The best method of treatment is to remove the horse from thermal stress by: (1) sending the horse North to a cooler climate, (2) sending the horse to a farm to rest under shade trees, (3) keeping fans or air-conditioning in the horse's stable, and (4) exercising the horse only in the early morning hours before the heat and humidity become too great.[8]

8. Instead of sending the horse North and based upon the advice of Dr. Brencick, Randall Ladnier, the son of the plaintiff and the horse's trainer, decided to "coax" Flush Pilot through the summer by placing fans in the stable, exercising him only in the early morning, and giving him electrolytes and clean, fresh water to replenish his necessary body fluids, thus minimizing thermal stress.[9]

9. On August 5, the day before he was to run at the Jefferson Downs Racetrack,[10] Flush Pilot was exercised in the early morning hours, but did not sweat. As Dr. Norwood was making his regular rounds at the racetrack, Randall Ladnier told him that Flush Pilot did not sweat after exercising that morning and asked Norwood whether it would be helpful to give the horse a "jug," i.e. a fluid container filled with a lactated ringer solution.[11] Flush Pilot had received a jug of lactated ringers on July 17, 1982[12] and the trainer felt the jug had worked well in helping ease Flush Pilot's anhidrotic condition. Dr. Norwood thought it would be helpful and suggested that a dose of Myosel-E[13] be added to the lactated ringers.

10. After the trainer agreed, Dr. Norwood administered intravenously to Flush Pilot a "jug" composed of 10 milliliters (ml) of Myosel-E added to 1000 ml of lactated ringers solution. After injecting approximately 100 ml of the jug, the horse began to stagger. Dr. Norwood immediately stopped administration of the solution; the horse fell down and Dr. Norwood administered epinephrine (also known as adrenaline) and solu-delta-cortef, in an attempt to resuscitate the horse. Flush Pilot died about ten to fifteen minutes after the initial onset of the reaction.[14]

11. Based upon the weight of the credible evidence, the Court finds that Flush Pilot suffered an anaphylactoid[15] reaction

---

6. Anhidrosis is a condition involving absence or insufficiency of sweat formation. It is primarily a disease of horses raised in temperate climates and subsequently imported to areas with hot humid climates. (Plaintiff's Exhibit 7).

7. See also Plaintiff's Exhibit 7.

8. Testimony of Dr. McClure and Dr. Brencick, an employee of Back-Stretch.

9. Testimony of Dr. McClure, Dr. Brencick, and defendant Dr. Norwood.

10. Plaintiff's Exhibit 9.

11. Lactated ringers are sterile, nonpyrogenic solutions of electrolytes intended for intravenous administration as fluid and nutrient and/or electrolyte replenishers. Nonpyrogenic means it is not capable of producing abnormal temperatures (such as fever) in the body. (Defendant's Exhibit A). An electrolyte is a liquid or solution containing enough ions to make it a conductor of electricity. An ion is an atom (or group of atoms) bearing an electric charge.

12. Defendant's Exhibit B.

13. The drug Myosel-E (also known as ESE) is "an emulsion of selenium-tocopherol used for the prevention and treatment of myositis syndrome in horses." (Defendant's Exhibit A). An emulsion is a type of mixture in which one liquid is dispersed throughout another liquid in the form of minute droplets. Selenium is a poisonous element resembling sulphur and can be toxic to horses if administered in excess. Tocopherol is the name used for Vitamin E or a substance related to it. In Myosel-E, the Vitamin E is found as d-alpha tocopheryl acetate.

14. Defendant's Exhibit D.

15. Anaphylactoid refers to a condition which resembles the sensitivity, reactions, or other manifestations of anaphylaxis. Anaphylaxis is the state of extreme sensitivity of a person or animal to the injection of a particular substance, usually a protein of another type of animal, or the actual reaction which follows such an injection. The severe reaction is generally brought on by a second or subsequent injection—not by the first. The first injection merely creates the condition of sensitivity for a subsequent injection. Anaphylactic means pertaining to the condition known as anaphylaxis.

from the drug.[16] It was Dr. McClure's opinion that the anaphylactoid reaction was most probably brought about by sensitivity to the Vitamin E in the solution.

12. Plaintiff first alleges that Dr. Norwood was negligent in administering Myosel-E to Flush Pilot when he knew or should have known that the horse was suffering only from anhidrosis and not myositis[17] or myositis syndrome,[18] and second, that he was negligent in failing to warn the trainer that Myosel-E had the potential to cause a fatal, anaphylactoid reaction.

13. The "package insert" provided by the manufacturer only recommends Myosel-E for use in preventing myositis syndrome.[19] However, both Dr. McClure and Dr. Harlan G. Bigbee, a representative of the manufacturer of Myosel-E (Schering Corp.), testified that Myosel-E can also be properly used as a preventive medicine for simple myositis.

14. The evidence is clear that the trainer did not request treatment for either myositis or myositis syndrome. Contradictory evidence was introduced as to whether Flush Pilot had myositis. Although Dr. Norwood testified that Flush Pilot was slightly muscle sore on August 5, the trainer, groom and exercise boy, all of whom had daily contact with the horse, and were in a better position to know whether Flush Pilot was muscle sore, all testified categorically that Flush Pilot was not muscle sore on August 5th and had never been a muscle sore horse. Therefore, this Court finds that Flush Pilot was not suffering from either myositis or myositis syndrome on the date of his death, August 5, 1982.

15. The Court finds that although plaintiff has proved that Dr. Norwood's use of Myosel-E in the treatment of anhidrosis was outside the recommendations of the "package insert," he has failed to prove that such use was negligence, that is that Dr. Norwood's conduct fell below the standard of care expected of equine specialists under the same or similar circumstances.

16. Schering Corporation neither recommends, nor warns against the use of Myosel-E in the treatment of anhidrosis.[20]

17. Dr. McClure, plaintiff's own expert, as well as Dr. Brencick, testified that it was proper to use Myosel-E outside the recommendations of the package insert and that drugs can be properly used by veterinarians in ways other than those recommended by the manufacturer.

18. The evidence shows that some veterinarians believe that the cause of anhidrosis is a Vitamin E deficiency and they recommend giving Vitamin E supplements to an anhidrotic horse.[21] Although the research literature only discusses the oral administration of Vitamin E, injectable Vitamin E by itself is not readily available and the only commonly available drug that contains Vitamin E in the injectable form is Myosel-E.[22]

19. Both Dr. McClure and Dr. Brencick testified it was not improper to use Myosel-E as a source of injectable Vitamin E to treat anhidrosis. Dr. McClure also testified that when Vitamin E and selenium are combined, as in Myosel-E, there is a synergistic[23] effect which is greater than when

16. Testimony of Dr. Norwood and Dr. McClure. Dr. P. Turk, who performed a necropsy, concluded that the internal damage suffered by the horse was "compatible with but not diagnostic of anaphylaxis." (Plaintiff's Exhibit 2).

17. Myositis is a condition involving inflammation of muscle. Essentially it is simple muscle soreness.

18. Myositis syndrome (also known as Selenium-Tocopherol Deficiency), which is different than myositis, is a condition involving certain observable clinical signs: namely, rapid respiration, profuse sweating, muscle spasms, stiffness, and elevated SGOT. (Defendant's Exhibit A).

19. Defendant's Exhibit A.

20. Plaintiff's Exhibit 13, Deposition of Harlan G. Bigbee, D.V.M. at pp. 32–33.

21. Plaintiff's Exhibit 16.

22. Testimony of Drs. McClure, Brencick and Norwood.

23. Synergism is the combined action of two or more medicinal substances to produce an effect greater than the sum of the individual effects when the substances act separately.

either substance is used alone. Therefore, Vitamin E and selenium combined will have a synergistic effect even more beneficial to a horse.

20. Both intravenous and oral administrations of Vitamin E carry the potential for an anaphylactoid reaction. Although the potential for reaction appears greater with intravenous administration, when Vitamin E is injected, it bypasses the digestive process, exerts its full metabolic effects promptly on cell metabolism and is more beneficial.[24]

21. Schering warns that Myosel-E has the potential to cause an anaphylactoid reaction in horses. Plaintiff contends that Dr. Norwood was negligent in failing to warn the trainer that Myosel-E could cause a fatal anaphylactoid reaction. It is undisputed that Dr. Norwood failed to warn Randall Ladnier that the administration of Myosel-E could cause an anaphylactoid reaction in Flush Pilot. Dr. Bigbee testified that the number of reported adverse reactions to Myosel-E was approximately four to six per year, the majority of which were fatally anaphylactoid in nature. He testified that in 1982, the approximate total reaction rate was one in every 25,000 dosages.

22. Dr. Brencick testified that he administers Myosel-E 5 or 6 times a week and he has *never* warned about the possibility of an anaphylactoid reaction.

Dr. McClure testified that she has *never* warned of the possibility of an anaphylactoid reaction with any drug she has ever used, including Myosel-E. She further testified that about 7 out of 10 drugs commonly used by veterinarians have the potential for anaphylaxis and that Flush Pilot had previously been given other drugs that had the potential for an anaphylactoid reaction. She also testified that in her opinion there is no duty to warn of a possible anaphylactoid reaction even when a drug is used in ways other than those recommended on the package insert.

23. Accordingly, this Court finds that plaintiff failed to prove by a preponderance of the evidence that there existed a legal duty requiring practitioners of equine medicine to warn about possible anaphylactoid reactions before administering the drug Myosel-E.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction (28 U.S.C. § 1332) and venue is proper in the Eastern District of Louisiana (28 U.S.C. § 1391).

2. The law of Louisiana controls, *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Defendants Dr. Norwood and Back-Stretch are engaged in the practice of veterinary medicine and are therefore bound by Louisiana law governing the licensure and conduct of veterinarians. La.R.S. 37:1511 *et seq.*

3. A party who causes damage to another through its own fault is obligated to compensate the injured party for that damage. La.C.C. art. 2315.

4. Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill. La.C.C. art. 2316.

5. In Louisiana the standard of care applicable to practitioners of veterinary medicine is whether the veterinarian "exercise(d) the degree of skill ordinarily employed under similar circumstances by the members of his own profession in good standing in his community." *Dyess v. Caraway*, 190 So.2d 666, 668 (La.App.2d Cir. 1966). *See also Hull v. Tate*, 45 O.B.A.J. 2455 (Okla.1974); *Kerbow v. Bell*, 259 P.2d 317 (Okla.1953).

6. The *Dyess* court looked to the existing Louisiana law concerning medical malpractice in order to formulate a standard of care for veterinarians. The seminal case in the area of medical malpractice is *Meyer v. St. Paul-Mercury Indemnity Co.*, 225 La. 618, 73 So.2d 781 (1953). *Meyer* held that:

> A physician, surgeon or dentist ... is not required to exercise the highest de-

**24.** Testimony of Dr. McClure. See Defendant's Exhibit A.

gree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case.

*Id.* 73 So.2d at 782.

7. Under Louisiana law, where a medical *specialty* is involved, "the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty." La.R.S. 9:2794 (A)(1).

8. This Court finds as a matter of law that defendants Dr. Norwood and Back-Stretch should be held, like physicians, to the standard of care expected of practitioners in their specialty, namely, equine medicine.

9. In a veterinary malpractice case, plaintiff has the burden of proving:

1) The degree of care ordinarily practiced by veterinarians within their particular specialty;

2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and,

3) That as a proximate result of this lack of knowledge or skill or failure to exercise this degree of care the plaintiff suffered injuries that would not have otherwise happened.

10. "In Louisiana tort cases, plaintiff must prove, by a preponderance of the evidence, both the negligence of the defendant and the damages caused by the latter's fault. ' ..." *Gums v. Delta Downs, Inc.*, 425 So.2d 303, 306 (La.App.3d Cir.1982).

11. A preponderance means that the evidence must show that it is more probable than not that the harm complained of was caused by the defendant's alleged tortious conduct. *Townsend v. State, Department of Highways*, 322 So.2d 139, 141 (La.1975);

*Napoli v. State Farm Mutual Auto Insurance Co.*, 387 So.2d 1351, 1353 (La.App. 1st Cir.1980).

12. This Court finds as a matter of law that the plaintiff has failed to carry his burden of proving by a preponderance of the evidence that the defendants were negligent.

13. Accordingly, let judgment be entered in favor of defendants Dr. Gary L. Norwood, D.V.M., Back-Stretch Surgery and Medicine, Inc., and Associated Indemnity Corporation and against plaintiff Royal M. Ladnier, dismissing plaintiff's suit at his costs.